(72 App. Div. 308.)

### PEOPLE ex rel. MADDEN v. DYCKER, Sheriff.

(Supreme Court, Appellate Division, Third Department. May 7, 1902.)

**1. CONSTITUTIONAL LAW—POLICE POWER—PROHIBITION OF USE OF TRADING STAMPS—UNLAWFUL DEPRIVATION OF LIBERTY AND PROPERTY.**

Laws 1900, c. 768, § 384p, forbidding the issue and distribution of trading stamps to be redeemed by any person other than the merchant who sells the goods with which such stamps are given, is not a lawful exercise of the police power, and is unconstitutional, as being an unlawful deprivation of liberty and property.

**2. LOTTERIES—ADVERTISING DEVICES—TRADING STAMPS.**

An advertising device, according to which an advertiser sells "trading stamps" to merchants, who issue them free with every purchase of a certain amount, the advertiser agreeing to redeem them in certain quantities with certain fixed articles, subject only to the stamp collector's choice, continuously on exhibition in a store maintained by the advertiser in the town wherein the stamps are issued for the purpose of such redemption, and nothing being required of the stamp collectors as a condition of redemption except that they obtain the stamps in connection with cash purchases of goods from the issuing merchants, does not appeal to the gambling instinct, and is not subject to prohibition as a lottery.

Appeal from special term, Sullivan county.

Habeas corpus by the people, on relation of Louis A. Madden, against John Dycker, sheriff. From an order dismissing the writ and remanding relator to custody, relator appeals. Reversed, and relator discharged.

Argued before PARKER, P. J., and KELLOGG, SMITH, CHASE, and FURSMAN, JJ.

Edwards & Bryan (Duncan Edwards, of counsel), for appellant.
John P. Roosa, Jr., for respondent.

CHASE, J. By chapter 768 of the Laws of 1900, section 384p was added to the Penal Code, as follows:

"Issue of Trading Stamps and Other Devices.—A person who shall: (1) Issue trading stamps or other devices to any person engaged in any trade, business or profession, with the promise, express or implied, that he will give to the person presenting to him such stamps or other devices, money or anything of value, without receiving from such person the value thereof, or make to any such person any concession or preference in any way, on account of the presentation of such trading stamps or other devices; or (2) being engaged in any trade, business or profession, shall distribute or present to any person dealing with him, any such trading stamp or other device, in consideration of any article or thing purchased of, or any services performed by him, shall be guilty of a misdemeanor. (3) It shall not be unlawful for any merchant or manufacturer to place his own tickets, coupons or other vouchers in or upon packages of goods sold or manufactured by him. Such tickets, coupons or other vouchers to be redeemed by such merchant or manufacturer either in money or merchandise, whether such packages are sold directly to the consumer or through retail merchants. Nor shall it be unlawful for any person to issue with such packages tickets, coupons or other voucher so issued by such merchant or manufacturer."

The Sperry & Hutchinson Company is a corporation organized under the laws of the state of New Jersey. The objects for which the corporation was formed are set forth in the certificate of incorporation, as follows:

"To buy, sell, and exchange merchandise; to do a general advertising business; to print, issue, and circulate advertisements; to make and carry out contracts with corporations and individuals; to advertise their business by special and useful devices; to give merchandise in exchange for trading stamps, which are to be certificates or vouchers to be sold by the corporation, and to be redeemed by it in merchandise, according to its contracts, rules and regulations."

The relator is in the employ of said company. Ralph B. Towner is engaged in the retail dry goods business at Monticello, N. Y. On the 27th day of December, 1901, said company, by the relator acting for it, entered into an agreement with said Towner, the material parts of which are as follows:

"That the said party of the first part, for the consideration hereinafter mentioned, agrees with the party of the second part to perform, in a faithful manner, the following, viz.: To print in the directory of their subscribers' book the name, business, and address of the party of the second part; to deliver to the people of this vicinity said books, and explain to them how to use the same; to open and maintain a store in the above-named town for the purpose of redeeming such stamps as are issued in the regular way by merchants duly authorized by the first party to handle the same; to keep on exhibition, in said store, goods and merchandise with which to redeem said stamps when presented in the above-mentioned books, and in lots of nine hundred and ninety (990) stamps collected in the regular way; to use their best endeavors to promote in every way the business interests and trade of the party of the second part. That the party of the second part, in consideration of the foregoing, agrees with the party of the first part to perform in a faithful manner the following, viz.: To receive of the party of the first part a sufficient number of trading stamps to be supplied as a discount for cash trade to all persons who may call for them, and the party of the second part also agrees to give out said stamps as follows, viz.: One (1) stamp to be given for each and every ten cents represented in a purchase, ten stamps for one dollar, etc. Said party of the second part also agrees not to dispose of said stamps in any other way; to pay the party of the first part 50 cents

per hundred for the use of all stamps disposed of, and to make weekly settlements with the authorized collector of the party of the first part; to display signs, furnished by said party of the first part, which read, 'We Give Trading Stamps,' in the windows of the place of business of the party of the second part. The party of the second part also agrees not to use any other coupons, trading stamps, or similar device during the existence of this contract."

The relator thereupon sold to said Towner one pad of trading stamps, consisting of 5,000 stamps, for $25, and said Towner agreed with him to distribute and present to cash customers said stamps, as provided by said contract. Such stamps consist of gummed paper about the size of postage stamps, the face side bearing the name of said company, and also the words "Trading Stamp." Books containing 990 blank spaces in which such trading stamps could be pasted were distributed, containing an "Explanation," including the following:

"When you have filled your book (33 pages) with green trading stamps from any or all of the merchants combined with whom we have contracted, it can be exchanged at our store, which is permanently located here, for your choice of over a thousand articles on exhibition. You will only receive stamps for the multiple of ten contained in your purchase. If your bill is twenty cents, you get two stamps; if it is thirty-five cents, you get three stamps, etc. Bear in mind the merchants make no advance in the price of their goods, and have so contracted with this company, but, on the contrary, the increase of trade secured by them by this plan will enable them to sell closer than ever before."

It appears that in the conduct of the trading stamp business by said company the articles of value to be exchanged for a book of stamps are exhibited continuously and openly in a store occupied by said company. Nothing of value is required from the person presenting the books of coupons, and nothing is required by the company from the collectors, except that they shall obtain the stamps in connection with cash purchases of goods. The articles to be exchanged for the stamps are certain and fixed, and only subject to the choice of the collector of the books of stamps.

On the same day that said contract was made and said book of stamps delivered to said Towner, a complaint was made against the relator to a justice of the peace, and a warrant was issued, upon which the relator was arrested, and he was committed to the sheriff to await the action of the grand jury. On the same day a writ of habeas corpus was issued, and the relator brought before the county judge of the county, who thereupon dismissed the same, and the relator was remanded to the custody of the sheriff of the county, from which order dismissing said writ this appeal is taken.

By chapter 691 of the Laws of 1887, there was added to the Penal Code, § 335a, as follows:

"No person shall sell, exchange or dispose of any article of food or offer or attempt to do so upon any representation, advertisement, notice or inducement that anything other than what is specifically stated to be the subject of the sale or exchange, is or is to be delivered or received or in any way connected with or a part of the transaction as a gift, prize, premium or reward to the purchaser. Any person violating any of the provisions of the foregoing section shall be deemed guilty of a misdemeanor. * * *"

76 N.Y.S.—8

This section of the Penal Code is included in chapter 8 thereof, entitled "Lotteries."

Thereafter a company doing business in the city of Albany had in front of their store a sign as follows: "Try our eight o'clock breakfast coffee. Checks given away with this coffee." The method pursued by such company was to give a purchaser of one pound of coffee a check, and when he had purchased two pounds he received two checks, which entitled him to a present. The articles which formed the inducement for the purchase were lying in full view of the purchaser on a counter, and his choice of anything on the counter was given him, provided he purchased as much as two pounds of coffee; that being the sole consideration upon which his right of choice depended. One Gillson purchased two pounds of coffee, and with the checks obtained a decorated cup and saucer, which was chosen by him from the articles so on the counter. He was arrested, charged with the violation of said section 335a, tried, and found guilty. The judgment was affirmed at the general term, but was reversed by the court of appeals. People v. Gillson, 109 N. Y. 389, 17 N. E. 343, 4 Am. St. Rep. 465. The court of appeals in the Gillson Case discussed at length the principles affecting the determination of that case, and such opinion has since been repeatedly approved by the courts of this state, and it has also been cited with approval in most of the other states of the Union. So far as the decision in that case affects this case it is controlling upon us. The opinion there states, as propositions firmly established and recognized, that a statutory enactment will not be declared unconstitutional, and therefore void, unless a clear and substantial conflict exists between it and the constitution; that every presumption is in favor of the constitutionality of legislative acts, and that the case must be practically free from doubt before an act of the legislature should be declared unconstitutional; that all property is held subject to the general police power of the state to so regulate and control its use in a proper case as to secure the general safety and the public welfare; that liberty in its broad sense, as understood in this country, means the right not only of freedom from servitude, imprisonment, or restraint, but the right of one to use his faculties in all lawful ways to live and work where he will, to earn his livelihood in any lawful calling, and to pursue any lawful trade or avocation. The court declared said section 335a unconstitutional, and in speaking of this statute say:

"It is evidently of that kind which has been so frequent of late,—a kind which is meant to protect some class in the community against the fair, free, and full competition of some other class; the members of the former class thinking it impossible to hold their own against such competition, and therefore flying to the legislature to secure some enactment which shall operate favorably to them, or unfavorably to their competitors, in the commercial, agricultural, manufacturing, or producing fields."

Again it says:

"The learned counsel for the people claims that the act is a valid exercise of the police power in furtherance of the policy of the state to prohibit the setting up of lotteries and the sale of lottery tickets. A careful reading of the statute fails to show any such purpose."

Again it says:

"The proof in this case shows there was no lottery or pretense of lottery in the transaction upon which the defendant was convicted of violation of the act. There was not the slightest element of chance in the case."

Again it says:

"I lay no stress whatever upon the argument that this kind of transaction naturally induces people to purchase more than they want of any article of food in order to get the other article with it which comes to them in the shape of a gift, and thus the poorer people are led to extravagance in outlay."

Again it says:

"It seems to me that to uphold the act in question upon the assumption that it tends to prevent people from buying more food than they may want, and hence tends to prevent wastefulness or lack of proper thrift among the poorer classes, is a radically vicious and erroneous assumption, and is to take a long step backwards, and to favor that class of paternal legislation which, when carried to this extent, interferes with proper liberty of the citizen, and violates the constitutional provision referred to."

It is therefore the settled law of this state that it is not within the police power of the legislature to prohibit the sale of any article of food upon any representation, advertisement, notice, or inducement that anything other than what is specifically stated to be the subject of the sale is to be delivered or received, or in any way connected with or a part of the transaction as a gift, prize, premium, or reward to the purchaser. In the Gillson Case the gift, prize, premium, or reward was not to be given with the purchase of one pound of coffee, but a person purchasing one pound of coffee obtained a check which it was necessary to retain until a further purchase of a pound of coffee enabled the purchaser to obtain a gift, prize, premium, or reward. Such sale of one pound of coffee, with the accompanying delivery of a check for use after a further purchase, does not make a case differing in principle from an arrangement or agreement making it necessary to obtain 10 or even 990 checks before a gift, prize, premium, or reward could be received. We are of the opinion that the Gillson Case determines that, notwithstanding the act in that case under consideration, articles of food can be sold upon the inducement that checks in the form of trading stamps are to be given in connection therewith, redeemable by the seller of the goods in lots of 990 checks or stamps, providing the gifts, prizes, premiums, or rewards are openly displayed upon the seller's counter, subject only to the choice of the person obtaining the checks or stamps.

Section 335a of the Penal Code has never been expressly repealed, but subsequently section 384p was enacted, which seems to expressly authorize the doing of much of that which is prohibited by section 335a, but at the same time in terms prohibits the issuing of trading stamps to any person engaged in business if accompanied with a promise that the person issuing the same will give such stamps, money, or anything of value without receiving from such person the value thereof, and also prohibits one engaged in business from distributing such stamps. The prohibitive part of section 384p aims at the practice of issuing trading stamps that are to be redeemed by any person other than the merchant who distributes them or the man-

ufacturer of the packages of goods sold. Just what there is in the thing prohibited differing from the thing expressly authorized that makes it inimical to the public welfare and general safety does not appear. This record does not disclose any element of chance in the transaction. Even the possibility of some of the stamps never being offered for redemption is largely eliminated by there being no time or boundary limit to the collection of the stamps, and nothing in the arrangement preventing holders of small lots of stamps from combining with others to make a sufficient number for redemption. The transaction is not a species of lottery, and does not appeal to the gambling instinct. People v. Gillson, 109 N. Y. 389, 17 N. E. 343, 4 Am. St. Rep. 465; Com. v. Sisson, 178 Mass. 578, 60 N. E. 385; Ex parte McKenna, 126 Cal. 429, 58 Pac. 916; State v. Dalton (R. I.) 46 Atl. 234, 48 L. R. A. 775.

Section 384p is not included in the articles of the Penal Code relating either to "lotteries" or "gaming." The mere fact that the stamps are redeemable by an agent of the principal or by a third person does not seem to affect the transaction so far as public safety and the general welfare of the community is concerned, or make it differ from the transaction declared to be within the prohibition of the constitution by the Gillson Case. Brannon, Const. U. S. Amend. 14, p. 309. The court in the case of State v. Dalton, supra, in discussing this question, say:

"It is to be observed that the act does not prohibit the vendor himself from giving, or 'throwing in,' as it is sometimes termed in common parlance, some other article in addition to that sold, but only prohibits the seller from giving anything in the nature of a check or order upon some other person which shall entitle the holder thereof to obtain from such other person some article of merchandise in addition to the thing sold. In other words, the act recognizes the right of a person to give away an article of merchandise in connection with and as an inducement to the making of a sale of some other article, but provides, in effect, that the giving of such additional article must be done by him directly, and not through a third person. We fail to see that there is any substantial difference in principle between the two methods, or that either bears any resemblance to a lottery. The element of chance, which is the basal principle of every scheme in the nature of a lottery, is wholly wanting."

In the same opinion the court, in illustrating its argument, say:

"A. buys of B. a suit of clothes for $20, and receives a check or stamp which entitles him to receive from O. a pair of shoes worth $2, a hat worth $2, or a pair of gloves worth $2. It is true that A. has not seen these articles at the time of purchasing the clothes, but, as he knows that he is to receive one of the articles mentioned as he may elect, we cannot see that there is anything so uncertain about the transaction as to appeal to the gambling instinct. At any rate, it does not in any real sense partake of the nature of a lottery. It is simply one of the infinite variety of devices which are resorted to by trades people in these days of sharp competition to promote the sale of their goods."

The same court in considering the practice of giving trading stamps, and its effect upon business, say:

"It may be demoralizing to legitimate business for two great rival dry goods houses to cut prices in the attempt to undersell each other, or for two competing railway lines to sell tickets at half price in the attempt of each to get an advantage over the other, yet probably no one would claim that such competition could be prohibited by law. 'Bargain Sales,' and 'Bargain

Counters' may be demoralizing to business, but probably no one would claim that they can be abolished by law. The invention of labor-saving machinery may be said to demoralize business, and so may numerous other modern innovations in manufacturing and industrial pursuits, whereby old methods have to be abandoned and new ones adopted. But whatever demoralization results therefrom is incidental to that principle of evolution which is everywhere manifest in the mercantile and industrial, as well as in the physical, world. The great law of competition invites and promotes this sort of demoralization, and the remedy for one who is injured by it lies, not in legislation, but in being able to keep pace with the changed, if not always improved, methods."

If the giving and redeeming of trading stamps is at any time so conducted as to be in fact a lottery or a gambling scheme, it can be punished under the provisions of the Penal Code relating to lotteries and gaming as the same are therein fully defined, and the acts as so defined prohibited. The section of the Code under which the relator was arrested is not a lawful exercise of the police power of the legislature, and it is in violation of the provisions of the constitution.

Order reversed, without costs, and relator discharged. All concur.