# Staunton.

## YOUNG v. COMMONWEALTH.

### September 17, 1903.

1. CONSTITUTIONAL LAW—*Meaning of "Liberty."*—The liberty of the citizen which is guaranteed by the Constitution of the United States and of this State embraces not only the right to go where one chooses, but to do such acts as he may judge best for his own interest not inconsistent with the equal rights of others, to follow such pursuits as he may deem best adapted to his faculties and will afford him the highest enjoyment, to be free in the enjoyment of all of his faculties, to be free to use them in all lawful ways, to live and work where he will, and to earn his livelihood by any lawful calling, and for that purpose to enter into all contracts which he may deem proper, necessary and essential to successfully conduct his private concerns.

2. CONSTITUTIONAL LAW—*Regulation of Private Business—Police Power.*— The only authority which a State has to prohibit, regulate or control the private business of a citizen grows out of its "police power," or power to enact laws pertaining to the public health, the public safety or the public morals. A statute regulating such private business in a manner which in no wise pertains to public health, safety or morals is not a valid exercise of the police power.

3. CONSTITUTIONAL LAW—*Police Power—Trading Stamps.*—The use of "trading stamps" by which a merchant gives to each cash purchaser at his store of a given amount of goods a stamp which upon presentation by the purchaser to a third person entitles such purchaser to receive from such third person some other specific article of merchandise in addition to his purchase, which article is known and ascertained beforehand, is a legitimate business which the State has no power to prohibit in the exercise of its police power.

4. CONSTITUTIONAL LAW—*Police Power—Lottery—Case at Bar.*—In the case at bar the evidence shows that the element of chance or lottery, in the use of "trading stamps" in this instance, was entirely wanting, as the articles to be received were fixed and certain, and

kept constantly on exhibition for inspection by persons proposing .
to take the "trading stamps."

5. CONSTITUTIONAL LAW—*Presumption of Validity.*—All laws are pre-
sumed to be constitutional, and not until the contrary is made
plainly to appear will the courts declare them unconstitutional.

Error to a judgment of the Circuit Court of Clarke county,
rendered May 20, 1903, affirming the judgment of the County
Court of said county, whereby the plaintiff in error was fined
the sum of ten dollars for violating the statute against the use
of "trading stamps."                                    .

*Reversed.*

The facts, as stated in the brief of the plaintiff in error, were
as follows:

"The Sperry & Hutchinson Company, the Trading Stamp
Company referred to in the record, is incorporated under the
laws of the State of New Jersey with a capital stock of $1,-
000,000 fully paid. The purposes for which it is incorporated,
as set forth in its certificate of incorporation, are: To buy,
sell and exchange merchandise; to do a general advertising
business; to print, issue and circulate advertisements; to make
and carry out contracts with corporations and individuals; to
advertise their business by special and useful devices; to give
merchandise in exchange for trading stamps, which trading
stamps are to be redeemed by it in merchandise according to
its contracts, rules and regulations.

"Preliminary to engaging in business in any State, city or
town, the Trading Stamp Company opens a store in said com-
munity and stocks it with certain well-defined standard articles
of merchandise such as it can at all times undertake to carry
on hand. These articles are all of substantial value, and, gen-
erally speaking, are such as may be useful and ornamental
about the household.

"The Trading Stamp Company then solicits business with
merchants in the community and enters into contracts with

them, wherein and whereby it undertakes to advertise the business of the merchant in the community aforesaid in and by the usual and ordinary mediums of advertising, as well as by such other useful, unique and novel methods as may from time to time occur. The advertising referred to consists of newspaper notices printed from time to time, in which the attention of the public is called to the business of the merchant; circulars containing his name, address and business, as well as the details pertaining thereto, are distributed in the community, and the trading stamp books containing the name of the merchant, his address and business are likewise distributed among the people who might be possible customers in his particular line of trade.

"The Trading Stamp Company also undertakes to furnish to the merchant, as a part of its general advertising scheme, its so-called 'trading stamps,' which are in appearance substantially like the ordinary postage stamp, convenient in size and so made as to be placed in the book issued by the Trading Stamp Company, and to redeem these stamps when collected and presented in books furnished for that purpose in the amount of nine hundred and ninety stamps, by delivering to the holder thereof one of the articles of merchandise carried in its said store. It also undertakes to keep the store which it has opened in the community supplied with premiums in all respects identical with those then on exhibition at its said store; and to permit the public and possible collectors of the stamps to inspect the goods, wares and merchandise which it carries as premiums at any and all times. The object and purpose of this is that the premiums which are to be exchanged for stamps may be inspected and their character and value made known to the public and possible collectors of said stamps at any time prior to the commencement of the collection of said stamps, or at any time thereafter.

"For the services thus to be rendered, for the use of the

stamps furnished, and for the premiums with which the stamps are to be redeemed, the merchant agrees to pay to the Trading Stamp Company at the rate of fifty cents (50c.) per hundred on the stamps, and to distribute them among his cash purchasers free of charge. For each ten cents (10c.) represented in a purchase he gives one stamp; for each one dollar ($1.00) represented in a purchase he gives ten stamps, and for each five dollars ($5.00) represented in a purchase he gives fifty stamps, and so on. It will thus be seen that, for a book of nine hundred and ninety stamps, the merchant will have sold ninety-nine dollars ($99.00) worth of merchandise, and will have paid to the Trading Stamp Company four and 95-100 dollars ($4.95). In other words, he will have paid to the Trading Stamp Company five *per cent.* on the amount of business done by him for the services rendered to him by it.

"The Trading Stamp Company does not claim that it redeems its stamps with articles of merchandise which cost it four and 95-100 dollars ($4.95). Out of that sum it pays the cost of advertising, the cost of its stamps, the cost of the article with which it redeems the stamps, and the balance represents its profit. It does claim, however—and experience has proven it to be true—that it can pay all of its expenses, can give a good, substantial and useful article of value—one which in many retail stores would cost more than the sum of four and 95-100 dollars—and make a fair margin of profit. It is enabled to do this because it is one of the largest consumers of merchandise in the country, and buys in such quantities that it can purchase these articles much lower and cheaper than any one else. It is also enabled to do this by reason of the fact that, in advertising a large number of merchants in a community, it can take and procure larger advertising space in the newspapers and at cheaper rates than a single individual can do. In other words, the Trading Stamp Company does for a number of merchants what each could do for himself, but which each could not do

so well for himself. Each merchant, of course, could do his own advertising, but he could not get the same rates as the Trading Stamp Company, which advertises a good many merchants at the same time. One merchant could procure his own premiums, but he could not get them as cheaply as the Trading Stamp Company, because he is not in the market for so large a quantity of merchandise. It is in its ability to buy merchandise at lower rates than other persons and to advertise at more reasonable rates than other persons that the success of the Trading Stamp business chiefly lies.

"The number of stamps for which the company undertakes to redeem in merchandise, to-wit: nine hundred and ninety, is a purely arbitrary one, fixed so because experience has shown that for that number a desirable and valuable article can be given. The number of stamps, however, is not essential to the system. If need be a smaller number could be redeemed with an article of lesser value, or a larger number with an article of greater value. But it has been found that the best and most convenient number is the one mentioned, to-wit, nine hundred and ninety (990).

"As we have already stated, for the purpose of letting the people in a community know precisely what they will get in exchange for the stamps, the very first step which the Trading Stamp Company takes is to open a store in that community and stock it with the premiums with which it proposes to redeem the stamps, and keeps the same open to the public for inspection at all times.. It then undertakes and agrees to carry at all times premiums identically like those at its store at the time the store was opened for the purpose of redemption. It undertakes to keep the store open for inspection to the public and possible collectors at all times. In this manner it seeks to make the public acquainted with the value and character of its premiums. If that were not its object, it would just as well require the stamps to be redeemed at a store in New York

Statement.

or some out-of-the-way place where its premiums may never be seen. It is to the interest of the company that the value and character of its premiums are known, ascertained and determined. Its success depends upon its good faith, and the fact that its premiums are valuable, known and ascertained. Hence it uses every effort to let the public know what they may expect and what they will get. It has so-called 'openings' to which the public are invited, and it prints advertisements with cuts showing the premiums given and invites inspection. In short, every effort is made to have the public know, ascertain and determine for themselves and to choose for themselves just what premiums they want.

"There is absolutely no uncertainty or indefiniteness about the premiums. The articles are certain and fixed, and the person about to collect a book of stamps has full opportunity to make up his mind what he will get in the store of the Trading Stamp Company when he is ready to have his book redeemed. All the articles redeemable for the same amount of stamps are, as nearly as practicable, of the same value. The slight variation is only that difference which makes two things of the same cost of different value in the eyes of different individuals. One might prefer a lamp, another a clock, another silver knives, another silver forks, and so on; but they are substantially of the same value. Each purchaser gets the same discount and the same value for his stamps. *In short, the premiums which are given in exchange for the stamps or in redemption thereof are made as definite, certain and known as it is possible for human agencies to make them.*"

*Marshall McCormick* and *W. Benton Crisp*, for the plaintiff in error.

*Attorney-General William A. Anderson,* for the Commonwealth.

Harrison, J., delivered the opinion of the court.

This writ of error brings in question the constitutionality of an act of the General Assembly approved February 19, 1898, entitled "An act to prohibit the use of trading stamps, trading checks, and similar gift enterprises, and providing a punishment for those who use them," which is in the following words:

"Be it enacted by the General Assembly of Virginia, that:

"1. No person shall sell or offer for sale any article or merchandise of any description whatever with the promise, express or implied, to give or deliver or in any manner hold out the promise of gift or delivery of any ticket, check, metal or paper stamp, or other written or printed promise or assurance, express or implied, that the said ticket, check, metal or paper stamp, or written or printed promise or assurance, may be used in payment or purchase of or exchange for any other articles of merchandise from any other person or corporation.

"2. It shall not be unlawful for any merchant or manufacturer to place tickets or coupons in packages of goods sold or manufactured by him, such tickets or coupons to be redeemed by such merchant or manufacturer either in money or in merchandise, whether such packages are sold directly to the customer or through retail merchants; nor shall it be unlawful for any person to give out with such package, tickets or coupons so given out by such merchant or manufacturer.

"3. Any person violating the provisions of this act shall be guilty of a misdemeanor, and shall be punished by a fine of not more than one thousand dollars, or be imprisoned in jail, not exceeding six months, or both, in the discretion of the justice or jury trying the offence."

Acts General Assembly 1897-'98, pp. 442, 443, c. 406.

On the 8th day of April, 1903, the plaintiff in error, a merchant doing business in the town of Berryville, Va., was arrested upon a warrant charging him with the violation of this

act, taken before a justice of the peace, tried, convicted, fined $10, and adjudged to pay costs. Upon appeal to the County Court of Clarke county this judgment was approved and affirmed, and upon further appeal the judgment of the County Court was affirmed by the Circuit Court of the same county. From this last-mentioned judgment a writ of error was awarded by this court.

The facts, as they appeared before the justice of the peace and as proven in the County Court, are substantially as follows: On the 8th day of April, 1903, a customer called at the store of the defendant, and bought one dozen cans of tomatoes, for which he paid the defendant the sum of $1.20, which was the fair and reasonable market value of the same, and was the regular price which the defendant charged all of his customers for such merchandise. After the purchase price was paid, the defendant delivered to his customer twelve tickets, checks, or stamps, commonly called "trading stamps." These stamps were issued to the defendant by a corporation organized and existing under the laws of the State of New Jersey, known as "The Sperry & Hutchinson Company," and were delivered to the customer by the defendant under and by virtue of the terms of a written agreement between the Sperry & Hutchinson Company and himself. By the terms of this agreement the company undertook to advertise the business of the defendant by the usual mediums of advertising, as well as by other unique and novel methods; to furnish the defendant its trading stamps, to be redeemed in the manner hereinafter mentioned; to print the name, business, and business address of the defendant in the subscriber's book issued by the company, and to deliver such books to the people living in the vicinity of Berryville, Va., explaining to them the use thereof, and to use its best endeavors to promote the business and trade of the defendant. In consideration of the foregoing the defendant agreed to take from the company from time to time

"trading stamps" in sufficient quantities to give each of his customers paying cash for their purchases one stamp for each and every ten cents represented in a purchase, ten for every dollar represented in a purchase, and so on. For the use of these stamps the defendant was to pay the company at the rate of 50 cents per hundred on all stamps given and distributed by him. The company further agreed to open a store or other place of business at Berryville, Va., for the purpose of redeeming such stamps as might be given and distributed by the defendant and its other subscribers, and to carry therein and keep on exhibition thereat a stock of goods consisting of albums, accordions, carving sets, cut-glass bowls, field glasses, opera glasses, silver-plated ware of various kinds, including knives, forks, and spoons, and many other useful articles too numerous to mention. With these articles the company agreed to redeem the stamps given and distributed by the defendant when presented by any one of his customers in lots of 990 stamps; the holder to designate the article with which he or she desired to have such stamps redeemed, the article or one identical therewith to be delivered to the holder at the time of the presentation of the stamps for redemption. And to this end the company agreed to keep its store open during the usual business hours, that the public might, during those hours, have the opportunity of inspecting the merchandise therein and selecting the articles with which they might desire to have their stamps redeemed. The proof shows that pursuant to the terms of this agreement the company has advertised the business of the defendant in the manner provided for by the contract, and has maintained in the town of Berryville a place of business in which it carries a number of the articles mentioned in the agreement for the redemption of stamps; that such articles may be inspected by all persons either prior or subsequent to making a purchase and receiving stamps from the defendant, and that upon accumulating 990 stamps the customer

will be entitled to present the same, and receive in exchange therefor from the company any one of the articles of merchandise mentioned that he may choose to select; that at the time of purchase of the one dozen cans of tomatoes the customer in question knew, through the advertisements circulated by the trading stamp company, that the defendant gave trading stamps with all cash sales, and for that reason purchased from the defendant in preference to some other merchants who did not give stamps; and also knew the general value of the articles of merchandise from which he would be entitled to have his selection in the redemption of such stamps.

The defendant contends that the Act of Assembly under which he is prosecuted deprives him of his liberty and property without due process of law, and is, therefore, in conflict with the fourteenth amendment to the Constitution of the United States, and is also in conflict with the Declaration of Rights of the State of Virginia.

The fourteenth amendment (section 1) provides that "no State shall make or enforce any law which shall abridge the privileges or immunities of the citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

The Declaration of Rights of the State of Virginia, as it existed at the time of the passage of this act and under the new Constitution, guaranties in all capital or criminal prosecutions the right of trial by jury, in order "that no man be deprived of his liberty except by the law of the land, or the judgment of his peers."

The word "liberty," as used in the Constitution of the United States and the several States, has frequently been construed, and means more than mere freedom from restraint. It means not merely the right to go where one chooses, but to do such acts as he may judge best for his interest, not incon-

sistent with the equal rights of others; that is, to follow such pursuits as may be best adapted to his faculties, and which will give him the highest enjoyment. The liberty mentioned is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling, and for that purpose to enter into all contracts which may be proper, necessary, and essential to his carrying out to a successful conclusion the purpose above mentioned. These are individual rights, formulated as such under the phrase "pursuit of happiness" in the Declaration of Independence, which begins with the fundamental proposition that all men are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness. *Powell* v. *Penn.*, 127 U. S. 678, 18 Sup. Ct. 992, 1257, 32 L. Ed. 253; *Allgeyer* v. *Louisiana*, 165 U. S. 578, 17 Sup. Ct. 427, 41 L. Ed. 832; *People* v. *Gillson*, 109 N. Y. 389, 17 N. E. 343, 4 Am. St. Rep. 465; *State* v. *Dalton* (R. I.), 46 Atl. 234, 48 L. R. A. 775, 84 Am. St. Rep. 818.

The statute under which this prosecution was had undertakes to prohibit and regulate and control the business of the defendant, and to prescribe penalties for its violation. It is, therefore, both prohibitory and penal in its character. It has been repeatedly held that the only authority which a State or municipality has for enacting legislation of this character grows out of what is known as its "police power." This has been generally defined to be that power which a State or municipality has to enact laws or ordinances which pertain to the public safety, the public health, or the public morals. The proposition above stated is so universally recognized that it does not require the citation of authorities. It follows, therefore, that, unless the statute in question is one which in some way provides for the public safety, pertains to the public health,

or concerns the public morals, it is not a valid exercise of the police power.

Statutes similar to that under consideration have been enacted in a number of States, and the courts, when called upon to construe such statutes with reference to the trading stamp business, have held that, in so far as they prohibit such business, they are unconstitutional. In the State of Rhode Island a statute substantially to the same effect was passed, and in *State* v. *Dalton*, 46 Atl. 234, 48 L. R. A. 775, 84 Am. St. Rep. 818, the Supreme Court of that State declared it unconstitutional. The court, after discussing the police power and citing numerous authorities, says: "We come, then, to the question whether the act before us is one which falls within the police power of the Legislature; for, if it is not, it is clearly an unlawful interference with private right." The court then proceeds by the process of elimination to demonstrate that the act does not look to, or in any manner concern, the public health; nor look to or tend to promote the public safety; or in any manner relate to or tend to promote public morals. The court says: "In this connection it is pertinent to observe that it is not enough to warrant the State in prohibiting a given business that it is conducted by methods which do not meet with general approval. There must be something in the methods employed which renders it injurious to the public in some one of the ways before mentioned in order to warrant the State in interfering therewith. Nor is it enough to bring a given business within the prohibitory power of the State that it is so conducted as to seriously interfere with or even destroy the business of others. Take, for illustration, the great department stores in our large cities. By reason of the almost infinite variety of goods which they carry they furnish greater facilities to customers, and can offer them greater inducements in the way of trade, than can those stores which carry but a single line of goods. The result is, as everybody knows, that

very many small traders have been crushed out, and obliged to abandon their business entirely, while the owner of the mammoth establishments, which supply almost everything which we eat, drink, wear, use, need, or desire, whether useful or ornamental, are prosperous and successful in a remarkable degree. But, while the result of this method of doing business is injurious to those who employ the more primitive one, can it be said that a law prohibiting a department store would be a valid exercise of the police power? Clearly not. A case decided no longer than December last holds that such a law is invalid. We refer to the case of *Chicago v. Netcher* (Ill. Sup.), 55 N. E. 707, 48 L. R. A. 261, 75 Am. St. Rep. 93, in which it was held that an ordinance prohibiting a person, firm, or corporation from exposing for sale or selling any meat, fish, butter, or other provisions in any place of business in the city where dry-goods, clothing, or drugs are sold tends in no way to protect the safety, health, or morals of the public, or to accomplish an object falling within the police power. . . . .

"It may be demoralizing to legitimate business for two great rival dry-goods houses to cut prices in the attempt to undersell each other, or for two competing railway lines to sell tickets at half price in the attempt of each to get an advantage over the other; yet probably no one would claim that such competition could be prohibited by law. 'Bargain sales' and 'bargain counters' may be demoralizing to business, but probably no one would claim that they can be abolished by law."

In discussing the question whether or not the transaction under consideration in *State v. Dalton* involved any element of lottery, the court says: "The method of doing business which the act prohibits is the giving by a vendor, in connection with the sale by him of any article or articles, of any stamp or other device which shall entitle the vendee to obtain from some other person some article of merchandise in addition to that actually sold. It is to be observed that the act does not prohibit the

vendor himself from giving or 'throwing in,' as it is sometimes called in common parlance, some other article in addition to that sold, but only prohibits the seller from giving anything in the nature of a check or order upon some other person which shall entitle the holder thereof to obtain from such other person some article of merchandise in addition to the thing sold. In other words, the act recognizes the right of a person to give away an article of merchandise in connection with and as an inducement to the making of a sale of some other article, but provides, in effect, that the giving of such article must be done by him directly, and not through a third person. We fail to see that there is any substantial difference in principle between the two methods, or that either bears any resemblance to a lottery. The element of chance, which is the basal principle in every scheme in the nature of a lottery, is wholly wanting.

"To illustrate: A buys of B twenty pounds of sugar for a dollar, and is given with the purchase an order, check, stamp, token, or some kind of device—no matter what—which, upon presentation to C, entitles A to some other specific article of merchandise in addition to the sugar. How does such a transaction differ in principle from one where A receives the premium for making the purchase—for such it really is—directly from B himself? In other words, how is it changed into a gambling transaction by the fact that the premium is received through the agency of C instead of being received directly from B? We cannot see that it is thus changed. The thing sought to be accomplished by the vendor is the sale of his goods by means of the inducement held out to the purchaser in the form of a premium, and, if he may himself give and deliver the premium—as he clearly may—he may also give it through a third person."

The court further says: "As to the argument before referred to, that the scheme is in the nature of a lottery, because the precise nature and value of the premium are un-

known to the purchaser, it is enough to reply. that nothing appears in the act or in the record before us to show this. The prohibition is that the purchaser shall not receive from any person other than the vendor 'any article of merchandise, other than that actually sold to said purchaser,' thereby implying that the parties to the transaction would be dealing with reference to some particular article, or, at any rate, some one of a given class of articles, in the possession of the third person, the nature and value of which were well understood. To illustrate again: A buys of B a suit of clothes for twenty dollars, and receives a check or stamp which entitles him to receive from C a pair of shoes worth two dollars, a hat worth two dollars, or a pair of gloves worth two dollars. . It is true that A has not seen these articles at the time of purchasing the clothes, but, as he knows that he is to receive one of the articles mentioned, as he may elect, we cannot see that there is anything so uncertain about the transaction as to appeal to the gambling instinct. At any rate, it does not in any real sense partake of the nature of a lottery. It is simply one of the infinite variety of devices which are resorted to by trades-people in these days of sharp competition to promote the sale of their goods."

"The complaint in the case before us expressly sets out that the stamps which were given by the defendant in connection with the sale entitled Perkins, the purchaser of the tobacco, to receive certain articles of merchandise from Sperry & Hutchinson at their store, thereby showing by a fair inference, we think, that it was well understood between the parties to the transaction what the articles were."

In further discussing the subject, this learned court says:

"The act, as we construe it, prohibits a person from selling a given article, and at the same time, and as a part of the transaction, giving to the purchaser a stamp, coupon, or other device which will entitle him to receive from some third person some other well-defined article in addition to the one sold. This is

equivalent to declaring that it is illegal for a man to give away
one article as a premium to the buyer for having purchased
another; for, as already intimated, it can make no possible
difference that the article given away with the sale is delivered
to the purchaser by a third person instead of the seller himself.
We think it is clear that such a prohibition is an unwarranted
interference with the individual liberty which is guaranteed to
every citizen, both by our State Constitution and also by the
fourteenth amendment to the Constitution of the United
States. . . . This inalienable right is trenched upon and
impaired whenever the Legislature prohibits a man from carry-
ing on his business in his own way, provided always, of course,
that the business and the mode of carrying it on are not in-
jurious to the public, and provided also that it is not a business
which is affected with the public use or interest. Now, it was
certainly within the constitutional right of the defendant in
this case to sell tobacco, it being presumed, of course, that he
had obtained the necessary authority to deal in that article;
and as an inducement to people to trade with him it was also
his right to give to each purchaser of a certain quantity of to-
bacco, either directly or through a third person, some other
designated article of value by way of premium. The statute
in question, however, steps in to prevent him from adopting
such a course to procure trade, and from it to secure an income
and livelihood, and he is thus restrained in the free enjoyment
of his faculties to which he is constitutionally entitled, unless
such restraint is necessary for the common welfare in one of
the ways heretofore mentioned; and we cannot see that it is.
In other words, the statute says that A shall not sell to B a
barrel of flour, and in connection with and as a part of the con-
tract of sale give to B a coupon which will entitle him to re-
ceive from C a pound of tea, a pitcher, a lamp, a clock, a door-
mat, or some other specified article of merchandise."

We have quoted very fully from the case of *State* v. *Dalton*

because the opinion is luminous, and considers every phase of the case before us so satisfactory that there is little to be added to what is there said. To the same effect, see *People* v. *Dycker*, 72 App. Div. 308, 76 N. Y. Supp. 111; *People* v. *Gillson*, 109 N. Y. 389, 17 N. E. 343, 4 Am. St. Rep. 465; *Ex parte Mc-Kenna*, 126 Cal. 429, 58 Pac. 916.

In the case at bar the element of chance or lottery is entirely wanting. There is no uncertainty or indefiniteness about the premiums. The articles are certain and fixed. They are kept constantly on exhibition, so that the person about to collect a book of 990 stamps has full opportunity to make up his mind what article he will select from the store of the Trading Stamp Company when he is ready to have his book of stamps redeemed. From the facts certified it appears that the articles for the redempton of stamps are on exhibition at the store of the company, that the customer who bought the tomatoes and received the stamps knew through the advertisements of the company that the defendant gave the stamps with all cash sales, and for that reason purchased from the defendant in preference to some merchant who did not give the stamps; and that said customer knew the general value and character of the articles from which he would be entitled to have his selection in redemption of stamps collected by him. We can find nothing in the contract between the Sperry & Hutchinson Company and the defendant, nor the transactions with customers in pursuance of such contract, that is not a legitimate exercise of one's right to prosecute his business in his own way. As already said, "it appears to be simply one of the many devices fallen upon in these days of sharp competition between tradespeople" to attract customers, or to induce those who have bought once to buy again, and in this respect is as innocent as any other of the many forms of advertising.

It is always to be presumed that acts of the General Assembly are passed in the utmost good faith, and also that they are

conformable to the Constitution; and it is not until the uncon-
stitutionality of a given act is plainly made to appear that the
court is called upon to declare it void.

Indulging every possible presumption in favor of the validity
of the statute now under consideration, we are constrained to
the conclusion, upon reason and authority, that it is not a valid
exercise of legislative power. It attempts to prohibit and re-
strain the defendant in the lawful prosecution of a lawful
business. "To justify the State in thus interposing its au-
thority in behalf of the public, it must appear, first, that the
interests of the public generally, as distinguished from those
of a particular class, require such interference; and, second,
that the means are reasonably necessary for the accomplish-
ment of a purpose not unduly oppressive upon individuals. The
Legislature may not, under the guise of protecting the public
interests, arbitrarily interfere with private business, or impose
unusual or unnecessary restrictions upon lawful occupations."
*Lawton* v. *Steele*, 152 U. S. 133, 137, 14 Sup. Ct. 499, 501,
38 L. Ed. 385.

It is further contended by the defendant that the act is un-
constitutional because it deprives him of the equal protection
of the law. That a comparison of sections 1 and 2 of the act
shows that it gives to one of its citizens—a manufacturer—
the right to use tickets, stamps, or coupons, while it denies to
another of its citizens the same privilege; and that it gives to
a merchant the right to make a gift to his customer, provided
he does so personally, while it denies to another merchant the
right to make a sale of his products and to accompany it with a
ticket, stamp, or order entitling his customer to receive from a
third person a gift or gratuity for which the merchant had con-
tracted; that the statute is, therefore, unequal in its operation
and purpose, because it does not give to all classes of merchants
the same protection and rights under the law.

Having come to the conclusion that the act cannot be sus-

tained as being a valid exercise of the police power, it becomes unnecessary to consider this last-mentioned point—namely, that the act is obnoxious to the fourteenth amendment, as being class legislation.

For these reasons the judgment complained of must be reversed, and this court will enter such judgment as the Circuit Court should have entered, reversing the judgment of the County Court of Clarke county, and discharging the defendant from custody.

*Reversed.*