[Crim. Nos. 1261, 1262.   In Bank.—September 23, 1905.]

## Ex Parte CHARLES F. DREXEL, on Habeas Corpus.
## Ex Parte J. C. HOLLAND, on Habeas Corpus.

HABEAS CORPUS—TRADING-STAMP LAW—CONSTITUTIONAL LAW—POLICE POWER.—The act of March 7, 1905, in so far as it makes it a misdemeanor to issue trading-stamps and coupons, is unconstitutional, and does not fall within the police power of the state; and one convicted thereunder will be discharged upon *habeas corpus.*

ID.—NATURE OF TRADING-STAMPS—LAWFUL CONTRACT—POWER OF LEGISLATURE.—An ordinary trading-stamp or coupon is, in substance, a mere form of allowing discounts on cash payments. It is not a lottery, and does not depend upon chance, and has no element of gambling of any kind; but it constitutes a lawful contract respecting property, within the protection of the constitution; and the legislature has no power to prohibit it or seriously to affect it under the guise of regulation.

APPLICATIONS for Writs of Habeas Corpus to the Chief of Police of the City and County of San Francisco.

H. G. W. Dinkelspiel, Mastick, Van Fleet & Mastick, and George S. Hupp, *Amicus Curiæ,* for Petitioners.

Lewis F. Byington, District Attorney, John Garber, Allen G. Wright, Charles A. Son, and W. B. Matthews, for Respondent.

McFARLAND, J.—These two causes are submitted together and involve the same questions. Each is a petitioner upon *habeas corpus* to be discharged from what is alleged to be an illegal imprisonment. Each petitioner is imprisoned upon a charge of misdemeanor for violating a certain act of the legislature of this state, approved March 7, 1905, which may be generally designated as the "Anti Trade Stamp or Coupon Act" (Stats. 1905, p. 67); and each contends that said act is invalid and is violative of section 1 of article I of the constitution of California, which declares that all men have the inalienable rights "of enjoying and defending life and liberty; acquiring, possessing, and defending property; and pursuing and obtaining safety and happiness"; and of section 1 of article XIV of the constitution of the United

States. If said act of March 7th is constitutional, then each petitioner should be remanded; if unconstitutional, then each should be discharged.

It is not necessary to enter here upon a wide discussion of the personal rights of citizens which are guaranteed by the constitutional provisions above noticed; they are established and declared by numerous decisions of many American courts. It is sufficient to quote the following declarations from two or three of the leading cases, each aptly stating the law upon the subject. The law as established in other states is very clearly expressed in *Young* v. *Commonwealth,* 101 Va. 853, [45 S. E. 327], where the supreme court of Virginia say: "The word 'liberty' as used in the constitution of the United States and the several states, has frequently been construed, and means more than mere freedom from restraint. It means not merely the right to go where one chooses, but to do such acts as he may judge best for his interest, not inconsistent with the equal rights of others; that is, to follow such pursuits as may be best adapted to his faculties, and which will give him the highest enjoyment. The liberty mentioned is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling, and for that purpose to enter into all contracts which may be proper, necessary, and essential, to his carrying out to a successful conclusion the purpose above mentioned. These are individual rights, formulated as such under the phrase 'pursuit of happiness' in the Declaration of Independence, which begins with the fundamental proposition that all men are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness." (Citing many cases.) And the court further declare that a statute prohibiting, regulating, or interfering with private business can be upheld only under the police power, and that the police power can be rightfully exercised only when the statute in question is for the protection of the public safety, the public health, or the public morals. Its language on this subject is as follows: "It has been repeatedly held that the only authority which a state or municipality has for enacting legislation of this

character grows out of what is known as its 'police power.' This has been generally defined to be that power which a state or municipality has to enact laws or ordinances which pertain to the public safety, the public health, or the public morals. The proposition above stated is so universally recognized that it does not require the citation of authorities. It follows, therefore, that, unless the statute in question is one which in some way provides for the public safety, pertains to the public health, or concerns the public morals, it is not a valid exercise of the police power." In our own state this court in *Ex parte Jentzsch,* 112 Cal. 468, [44 Pac. 803], say as follows: "It may be suggested in passing that our government was not designed to be paternal in form. We are a self-governing people, and our just pride is that our laws are made by us as well as for us. Every individual citizen is to be allowed so much liberty as may exist without impairment of the equal rights of his fellows. Our institutions are founded upon the conviction that we are not only capable of self-government as a community, but what is the logical necessity, that we are capable, to a great extent, of individual self-government. . . . The spirit of a system such as ours is, therefore, at total variance with that which, more or less veiled, still shows in the paternalism of other nations. . . . In brief, we give to the individual the utmost possible amount of personal liberty, and, with that guaranteed him, he is treated as a person of responsible judgment, not as a child in his nonage, and is left free to work out his destiny as impulse, education, training, heredity, and environment direct him. So, while the police power is one whose proper use makes most potently for good, in its undefined scope and inordinate exercise lurks no small danger to the republic. For the difficulty which is experienced in defining its just limits and bounds, affords a temptation to the legislature to encroach upon the rights of citizens with experimental laws, none the less dangerous because well meant." We will indulge in only one more quotation on this general subject, which is taken from a recent decision of this court in Bank (*Ex parte Hayden, ante,* p. 649, [82 Pac. 315].) In the opinion in that case many leading authorities are cited. The court, speaking through Mr. Justice Henshaw, say: "Putting out of consideration, therefore, the fundamental right of the

government to subject private property to taxation and to take such property in time of public calamity or peril, the right of the state to impose burdens upon such property where the business is legitimate and innocuous, in other words, to regulate harmless vocations, is found in the police power alone. (*Young* v. *Commonwealth,* 101 Va. 853, [45 S. E. 327]; *Holden* v. *Hardy,* 169 U. S. 366, [18 Sup. Ct. 383].) The police power, deriving its existence from the rule that the safety of the people is the supreme law, justifies legislation upon matters pertaining to the public welfare, the public health, or the public morals. (Cooley on Constitutional Limitations, 7th ed., p. 837; *Ruhstrat* v. *People,* 185 Ill. 133, [76 Am. St. Rep. 30, 57 N. E. 41].) But the legislature, under the guise of police regulations, cannot enact laws which do not pertain to one or the other of these objects, and which impose onerous and unnecessary burdens upon business and property. By this court it has been said (*Ex parte Whitwell,* 98 Cal. 73, [35 Am. St. Rep. 152, 32 Pac. 870]): But it is not true that when this power is exerted for the purpose of regulating a business or occupation which in itself is recognized as innocent and useful to the community, the legislature is the exclusive judge as to what is a reasonable and just restraint upon the constitutional right of the citizen to pursue such business or profession. As the right of a citizen to engage in such a business or follow such a profession is protected by the constitution, it is always a judicial question whether any particular regulation of such right is a valid exercise of legislative power. . . . This principle is stated very forcibly in the case of *Mugler* v. *Kansas,* 123 U. S. 661, [8 Sup. Ct. 297], in the following language: 'The courts are not bound by mere forms, nor are they to be misled by mere pretense. They are at liberty—indeed, are under a solemn duty—to look at the substance of things whenever they enter upon the inquiry whether the legislature has transcended the limits of its authority. If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the constitution.' " (See, also, *Stimson Mill Co.* v. *Braun,*

136 Cal. 122, [89 Am. St. Rep. 116, 68 Pac. 481]; *In re Kelso,* *ante,* p. 609, [82 Pac. 241].)

The law, therefore, being settled that the legislature cannot prohibit or seriously interfere with the right of the citizen to make harmless contracts touching the acquisition, protection, management, and enjoyment of property,—contracts which do not wrongfully affect the lawful rights of others or the public safety, health, or morals,—the remaining question in these cases at bar is whether trading-stamps or coupons constitute contracts which are outside the protection of the constitutional principles above declared.

Neither of the complaints in these cases contains a copy of the stamp or coupon which the petitioner is charged with issuing, and the act of the legislature in question does not definitely describe such stamp or coupon. But the general character of trading-stamps or coupons is a matter of common knowledge. They are somewhat different in form; and one in common use is substantially this: each time a customer purchases goods from a merchant and pays for them in cash, the merchant gives him a memorandum in writing— called a stamp or coupon—which expresses in money value a small percentage of the price of the goods bought and paid for, and entitles him, after he has accumulated a certain number of such coupons, to use them, to the extent of their face value, in payment for any other goods of the merchant which he may afterwards desire—or goods of some other person or trading company who has undertaken to redeem the coupons. There is generaly issued with the stamp or coupon a catalogue of articles from which the holder of the coupon may afterwards select; and such, as we understand it, was the fact in the cases at bar. And such a stamp or coupon, whether or not accompanied by such a catalogue, is prohibited by the act in question. (There is a reference in the act to property which at the time of the purchase is "unselected or unidentified" which the respondent contends distinguishes it from other anti-trading-stamp acts which have been declared unconstitutional; and this contention will be noticed hereafter.) We see nothing in such a stamp or coupon which is outside of the constitutional rights of citizens to make contracts concerning property; nothing which wrongfully interferes with the lawful rights of other persons; and nothing

which the police power can reach as touching the public safety, the public health, or the public morals. Of course, contracts containing lotteries, advantages dependent upon chance, or any kind of gambling scheme, may be regulated or suppressed. But a trading coupon has none of these characteristics; it is not a lottery; its redemption does not depend upon chance, and it has no element of gambling of any kind. Its holder selects what goods he wants; he is not compelled to take what chance may give him, or to get nothing if the throw of the dice, or the event of some other gambling device, shall so determine. It is, therefore, a contract which, under the principles above stated, the legislature has no constitutional power to prohibit, or to seriously interfere with under the guise of regulation; and as the act in question undertakes to do this, it is unconstitutional and void.

The view above stated is amply supported by the current of judicial authority. Anti-trading-stamp statutes have been passed in many states, and they have been almost invariably held unconstitutional by the courts. A leading case on the subject is *People* v. *Gillson*, 109 N. Y. 389, [4 Am. St. Rep. 465, 17 N. E. 343]. The act of the legislature under review in that case provided that "No person shall sell, exchange or dispose of any article of food or offer or attempt to do so upon any representation, advertisement, notice or inducement. that anything other than what is specifically stated to be the subject of the sale or exchange, is or is to be, delivered or received or in any way connected with or a part of the transaction as a gift, prize, premium or reward to the purchaser." The act was held void, and in an elaborate discussion the court, after stating the constitutional rights of citizens as hereinbefore declared, said, among other things, as follows: "It is quite clear that some or all of these fundamental and valuable rights are invaded, weakened, limited or destroyed by the legislation under consideration. It is evidently of the kind which has been so frequent of late, a kind which is meant to protect some class in the community against the fair, free and full competition of some other class, the members of the former class thinking it impossible to hold their own against such competition, and therefore flying to the legislature to secure some enactment which shall operate favorably to them or unfavorably to their competitors in the

commercial, agricultural, manufacturing or producing fields. By the provisions of this act a man owning articles of food which he wishes to sell or dispose of is limited in his powers of sale or disposition. A liberty to adopt or follow for a livelihood a lawful industrial pursuit, and in a manner not injurious to the community, is certainly infringed upon, limited, perhaps weakened or destroyed by such legislation.'' And, further, ''It cannot be truthfully maintained that this legislation does not seriously infringe upon the liberty of the owner or dealer in food products to pursue a lawful calling in a proper manner, or that it does not, to some extent at least, deprive a person of his property by curtailing his power of sale, and unless this infringement and deprivation are reasonably necessary for the common welfare, or may be said to fairly tend in the direction or to that result, the legislation is invalid as plainly violative of the constitutional provision under discussion. . . . The learned counsel for the people claim that the act is a valid exercise of the police power, in furtherance of the policy of the state to prohibit the setting up of lotteries and the sale of lottery-tickets. A careful reading of the statute fails to show any such purpose. . . . It says nothing' as to any lottery, and does not confine its prohibition to the giving away or distribution of any other article of property by virtue of any scheme founded upon chance. The act, in effect, absolutely prohibits the giving away of any other thing with the food sold and as part of the transaction of sale, wholly regardless of the means used to effect the giving away or delivery of such other article.'' Afterwards, another anti-trading-stamp act was passed by the legislature of the state of New York which prohibited the giving of trading-stamps redeemable by any person other than the one issuing them; and this act was held unconstitutional in *People* v. *Dycker,* 72 App. Div. 308, [76 N. Y. Supp. 111], where the court said: ''Just what there is in the thing prohibited, differing from the thing expressly authorized that makes it inimical to the public welfare and general safety does not appear. This record does not disclose any element of chance in the transaction. Even the possibility of some of the stamps never being offered for redemption is largely eliminated by there being no time or boundary limit to the collection of the stamps, and nothing in the ar-

rangement preventing holders of small lots of stamps from combining with others to make a sufficient number for redemption. The transaction is not a species of lottery, and does not appeal to the gambling instinct. [Citing cases.] . . . The mere fact that the stamps are redeemable by an agent of the principal or by a third person does not seem to affect the transaction so far as public safety and the general welfare of the community is concerned, or make it differ from the transaction declared to be within the prohibition of the constitution by the Gillson case. . . . If the giving and redeeming of trading-stamps is at any time so conducted as to be in fact a lottery or a gambling scheme, it can be punished under the provisions of the Penal Code relating to lotteries and gaming, as the same are therein fully defined, and the acts as so defined prohibited.'' And another anti-trading-stamp act was held unconstitutional in *People* v. *Zimmerman*, 102 App. Div. 103, [92 N. Y. Supp. 497]. In Pennsylvania an act purporting to be for the suppression of ''lottery gifts by storekeepers and others to secure patronage'' was held to be unconstitutional, as far as it undertook to suppress ordinary trading-stamps, in *Commonwealth* v. *Moorehead,* 7 Co. Rep. (Pa.) 513, the court saying: ''A mere chance to draw a prize, a ticket which may bring the holder a prize worth one cent, or one worth $100, or nothing, the result depending on chance, is one thing. A memorandum or check entitling him to demand and receive money or another article of like value to be selected by himself is a very different kind of thing.'' Similar decisions have been made in Rhode Island (*State* v. *Dalton*, 22 R. I. 77, [84 Am. St. Rep. 818, 46 Atl. 234, 48 L. R. A. 775]); in Alabama (*State* v. *Shugart,* 138 Ala. 86, [100 Am. St. Rep. 17, 35 South 28]); in Virginia (*Young* v. *Commonwealth,* 101 Va. 853, [45 S. E. 327]); in Vermont (*State* v. *Dodge,* 76 Vt. 197, [56 Atl. 983]); in North Carolina (*City of Winston* v. *Beeson,* 135 N. C. 271, [47 S. E. 457]); in Georgia (*Hewin* v. *City of Atlanta,* (Ga.) 49 S. E. 765); in New Hampshire (*State* v. *Ramseyer* (N. H.) 58 Atl. 958); and in Colorado by a very recent decision of the county court of Teller County, in a case entitled *People* v. *Beer.* The opinion in this case is given in full in petitioner's brief, but it is probably not yet published, as no reference is given to any publi-

cation.   Petitioners also present a certified copy of a recent
decision of the United States circuit court in and for the
western district of Washington, holding that a statutory pro-
vision exactly similar to the one here under review is uncon-
stitutional.   It was a *habeas corpus* case; and by the decision
it is declared that: ''Being fully advised in the premises the
court finds that: 'An act making it a misdemeanor to sell or
exchange property under the representation, advertisement,
notice or inducement that an unidentified, unknown, unse-
lected, or chance prize, premium or premium gift, or that a
stamp, trading-stamp, coupon, or other like device, entitling
the holder to receive a prize, premium or premium gift, or
that the redemption of such a stamp, trading-stamp, coupon
or other like device so given is to be part of the transaction,
or to sell or exchange any trading-stamp, stamp, coupon, or
other like device, to aid such sale or exchange as aforesaid,
and providing a penalty therefor,' is unconstitutional and
void, and is in violation of the rights of petitioner secured
to him by the fourteenth amendment to the constitution of
the United States; that the petitioner's arrest and imprison-
ment is illegal.''   In *Ex parte McKenna,* 126 Cal. 429, [58
Pac. 916], the unconstitutionality of the statute here in ques-
tion was, we think, satisfactorily declared.   In that case
there was involved the validity of an ordinance which im-
posed a license-tax upon merchants doing business to a cer-
tain amount who did not use trading-stamps, and a tax eight
times greater upon merchants, doing business no matter how
small, who did use such stamps.   The ordinance was held
invalid, and the court in Bank, speaking through Beatty, C.
J., said: ''In support of the ordinance, it is contended that
the trading-stamp device is a lottery in disguise, and there-
fore immoral.  ·But we cannot see that it has any resemblance
to a lottery.   There is in it no element of chance, and noth-
ing in the nature of gaming.   It appears to be simply a
device to attract customers, or to induce those who have
bought once to buy again, and in this aspect is as innocent
as any form of advertising.   And, besides, if it were a lottery
in disguise,—a mere device to cloak a gambling scheme,—
it would be unlawful and not the subject of a license.   The
ordinance, therefore, cannot be upheld on this ground.   It is
not an ordinance to prohibit an immoral practice or to regu-

late a hazardous or offensive business, or the conduct of a lawful game or public exhibition. It is, under the guise of a revenue measure, an evident attempt to put an end to the issue and redemption of trading-stamps by levying a discriminating and prohibitory tax upon the dealers who resort to that method of attracting customers.''

Respondent's counsel cite a few cases which, they contend, go directly to the subject of trading-stamps, and support the validity of the act here in question,—notably, *State* v. *Hawkins*, 95 Md. 146, [93 Am. St. Rep. 328, 51 Atl. 850]; *Humes* v. *City of Fort Smith*, 93 Fed. 857; and *Lansburgh* v. *District of Columbia*, 11 App. Cases, D. C. 512. With respect to these cases, we do not deem it necessary to consider the suggestion of petitioners that they are distinguishable from the mass of cases above cited; whatever they may hold, they are not of sufficient consequence to ruffle the great current of authority which runs the other way.

The statute in question here makes it a misdemeanor to issue a trading-stamp or coupon for ''anything unidentified by or unselected by the purchaser at or before the time of the sale,'' and which at the time of the sale shall not be ''completely identified beyond the necessity of any further or other selection''; and it is contended by respondent that this feature of the statute takes it out of the principle declared in many of the authorities above cited. We do not see any merit in this contention. There is still no element of chance or gambling in the transaction, whether the purchaser is allowed to make his selection when he is ready to do so, or whether he be compelled at the time of the purchase to then and there limit his choice to some one article, which he might not want when in the future he has accumulated sufficient coupons to be used. Usually a list of articles from which a selection may be made accompanies the coupon; but whether so or not, he is in either event forced by the statute to make his selection at the time he receives his first coupon. This requirement destroys in a great measure the efficiency of the system, and has no relation whatever to the protection of the public safety, the public health, or the public morals. On this point respondent relies greatly on the Maryland case of the *State* v. *Hawkins*, 95 Md. 146, [93 Am. St. Rep. 328, 51 Atl. 850]. That case was afterwards construed by the

criminal court of Baltimore to refer only to the case where the article to be obtained by the holder of the stamp "was to be determined by some lot or chance." (*State* v. *Frankel,* decided September 12, 1902, cited in petitioners' closing brief, where the opinion is quoted in full.) If this construction be correct, then the Hawkins case is not out of harmony with the current of decisions; but if it necessarily goes to the extent claimed by respondent, then we cannot approve it.

We see no force in the contention that the act is proper as protecting the holders of trading-stamps from the fraud and deceit of those who issue them. Of course, the value of any contract depends upon the good faith of each contracting party; and the contracts evidenced by trading-stamps are no more subject to the failures of those issuing them to comply with their promises than are any other valid contracts. Such failures would soon end the business.

The act in question has a clause prohibiting the coupon when the selection of the property "will depend upon chance or hazard in any manner whatever"; but this clause need not be here considered, because there is no averment in the complaint, nor is it claimed, that there is here any chance or hazard involved, unless the general nature of the business of issuing trading-stamps inherently includes chance or hazard; and, as we have before stated, it does not.

Indeed, an ordinary trading-stamp or coupon is in substance a mere form of allowing discounts on cash payments, and its issuance is entirely harmless and within the constitutional right of contract. It may be distasteful to certain competitors in business; but the latter should remember that if a statute suppressing it be upheld, then other oppressive statutes might be enacted unlawfully interfering with and hampering business and the right of contract to which these competitors would strenuously but vainly object.

Our conclusion is, that the said act of March 7, 1905, so far as it undertakes to make the issuance of trading-stamps and coupons such as were used by the petitioners herein a misdemeanor, is unconstitutional and void.

The petitioners Charles F. Drexel and J. C. Holland are discharged from custody.

Angellotti, J., Lorigan, J., Shaw, J., Van Dyke, J., Henshaw, J., and Beatty, C. J., concurred.