## UNITED STATES v. MILLS.
### No. 2247.

District Court, D. Maryland.
July 12, 1934.

Bernard J. Flynn, U. S. Atty., and Cornelius Mundy, Asst. U. S. Atty., both of Baltimore, Md., Charles Fahy, First Asst. Sol., Department of Interior, of Washington, D. C., Chas. I. Francis, Sp. Asst. to Atty. Gen., and Robt. L. Stern, Atty. Petroleum Administration Board, of New York City, for the United States.

Alex. Armstrong and Arthur W. Machen, Jr. (of Armstrong, Machen & Allen), both of Baltimore, Md., and Scott M. Wolfinger and D. K. McLaughlin, both of Hagerstown, Md., for defendant.

CHESNUT, District Judge.

This case arises in the course of administration of the National Industrial Recovery Act (15 U. S. C. c. 15, § 701 et seq. [15 USCA § 701 et seq.], 73rd Cong. 1st Sess., 48 Stat. 195). The plaintiff is the Government of the United States which is seeking to enforce against the defendant, a retail vendor of gasoline, by injunction, applied for by the bill in equity in this case, the provision against premium giving of Rule 17 of Article V of the Code of Fair Competition for the Petroleum Industry, approved by the President on August 19, 1933, pursuant to section 3 (a) of title 1 of the Recovery Act (15 USCA § 703 (a). The rule reads as follows:

"Except by permission of the Planning and Co-Ordination Committee, the refiners, distributors, jobbers, wholesalers, retailers and others engaged in the sale of petroleum products shall not give away oil, premiums, trading stamps, free goods or other things of value or grant any special inducement in connection with the sale of petroleum products."

It is alleged by the Government, and admitted by the defendant, that he does in the course of his business at times give away other articles of merchandise, such as glass and china ware, without extra charge therefor, in connection with the sale of a certain quantity of gasoline, usually five gallons. The articles so freely given do not involve any element of chance but are definitely described in advertisements thereof publicly made by the defendant. It is not denied by him that his course of dealing in this respect is contrary to the provisions of the rule, but he bases his resistance to its enforcement against him on certain principles of federal constitutional law which include:

(a) The contention that the Recovery Act is invalid because it is a delegation of congressional authority to the executive officers of the Government without a delineation of definite principles to be applied in administration of the law;

(b) That the enforcement of the rule against him will deprive him of property without due process of law in violation of the Fifth Amendment; and

(c) That if the Act is valid, its scope is necessarily limited to the extent of authority given to Congress by the Constitution, article 1, § 8, cl. 3, "To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes," and by clause 18 "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof"; and that the defendant's business practice, which is objected to, is not within the range of the constitutional power so given to Congress, especially as it is expressly provided by the Tenth Amendment "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

It is obvious that if any one of these propositions advanced by the defendant is sound, the bill must be dismissed. I will begin with the last, as it deals with the scope and extent of the Act rather than with its constitutionality as a whole. The case has been submitted for final decree upon bill, answer and testimony in open court.

Counsel for the Government in this case concede that the Recovery Act is based on the power of Congress to regulate commerce among the several states and make no contention for other constitutional authority for it. As I concur in this view, it will be unnecessary to consider any other possible constitutional basis for the Act. (Note I.) The question for decision, therefore, is whether the particular provision of the Petroleum Code above quoted, which is sought to be enforced against the defendant, is within the scope of the power of Congress to regulate commerce among the several states, as construed and applied by the Supreme Court.

At the outset it is to be observed that the defendant's activity sought to be enjoined is not an incident of interstate commerce. He is the proprietor of four gasoline filling stations of the ordinary type, one in Hagerstown, Maryland, one in Frederick, Maryland, one in Shippensburg, Pennsylvania, and one in Chambersburg, Pennsylvania. He purchases gasoline from the Republic Oil Company in Baltimore, Maryland, and has it transported to his trackside filling stations at the four locations. The shipments of gasoline

---

Note I. It was held there is none, by Judge Dawson in Hart Coal Corporation v. Sparks (D. C. Ky.) 7 F. Supp. 16.

from Baltimore to the Pennsylvania towns are obviously operations in interstate commerce but in themselves have no bearing on the case; nor is there any course of dealing between the defendant's Maryland and Pennsylvania filling stations involved in the case. What is complained of by the Government is the purely local giving of premiums upon the sale of gasoline to individual purchasers at the several filling stations. The interstate commerce involved in the shipments from Baltimore to the Pennsylvania filling stations has obviously ceased when the gasoline is placed in the defendant's tanks at Chambersburg and Shippensburg, and it appears from the evidence that, so far as the Maryland stations are concerned, the interstate traffic had ceased even before the defendant's purchases from the general storage supply of the Republic Oil Company in Baltimore. Gasoline is, of course, the product of refining crude petroleum and the latter is not produced in Maryland. It appears that the Republic Refining Company procures its crude petroleum, which is refined into gasoline, from Texas. Its movement into Maryland is, of course, interstate commerce but this interstate movement is complete when the gasoline reaches the general storage supply of the Republic Oil Company in Baltimore where it is purchased by the defendant. These particular facts are but incidents of the case. The essence of the question involved is whether after the interstate movement of the petroleum and the gasoline, its product, has ceased, the sale thereof *at retail within a particular state* by the defendant is within the regulatory power of the section of the Petroleum Code which prohibits the retailer from giving a premium to the purchaser as an inducement to his purchase. The retail sales are made to ultimate consumers and are not intended for movement in interstate commerce (although of course there is no prohibition on the disposition thereof by the purchaser).

It is clear the defendant is engaged purely in the internal commerce of a state and not in commerce among the several states. Nashville, C. & St. L. Ry. v. Wallace, 288 U. S. 249, 266, 53 S. Ct. 345, 77 L. Ed. 730, 87 A. L. R. 1191; Edelman v. Boeing Air Transport, 289 U. S. 249, 53 S. Ct. 591, 77 L. Ed. 1155; Rast v. Van Deman, 240 U. S. 342, 360, 36 S. Ct. 370, 60 L. Ed. 679, L. R. A. 1917A, 421, Ann. Cas. 1917B, 455; Industrial Association v. United States, 268 U. S. 64, 79, 45 S. Ct. 403, 69 L. Ed. 849; Hammer v. Dagenhart, 247 U. S. 251, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann.

Cas. 1918E, 724; Coe v. Errol, 116 U. S. 517, 6 S. Ct. 475, 29 L. Ed. 715; Chassaniol v. City of Greenwood, 291 U. S. 584, 54 S. Ct. 541, 78 L. Ed. 1004. Indeed it would be difficult to state an activity more clearly involving only intrastate commerce than the business of local sales of gasoline from filling stations. "Gasoline is one of the ordinary commodities of trade, differing, so far as the question here is affected, in no essential respect from a great variety of other articles commonly bought and sold by merchants and private dealers in the country." Williams v. Standard Oil Co., 278 U. S. 235, 240, 49 S. Ct. 115, 116, 73 L. Ed. 287, 60 A. L. R. 596. The Government does not contend to the contrary. Its position, as stated in the brief of its counsel, is as follows:

"The Government does not claim that the use of premiums in connection with the retail sale of gasoline *is* interstate commerce. The Government contends that the retail sale of gasoline and the practices which control the prices at which gasoline is sold *have a substantial and direct effect on interstate commerce* in gasoline and crude petroleum throughout the Nation."

It is thus important to note, in delimiting the precise legal issue presented, that the defendant's activities complained of are clearly not in the course of commerce among the states, or in the stream or current thereof, but nevertheless the Government does contend that the defendant's intrastate activity is subject to national regulation because it has "a substantial and direct effect on interstate commerce." And it is said by counsel for the Government that the factual basis for this contention is to be found in the testimony in the case which somewhat elaborately presents a comprehensive picture of the Petroleum Industry of the United States with special reference to the sale of gasoline.

I find the following relevant facts to be established by the testimony.

Petroleum constitutes the third largest national industry. It begins with the production of crude petroleum from oil wells in 17 or 18 states. The wells are of two classes, referred to as "stripper" wells (where the oil has to be pumped from the well) and "flush" wells (where the oil flows from the ground without the expense of pumping). The flush fields are practically limited to the States of Texas, Oklahoma and California. Only a relatively small proportion of the total oil produced is consumed in the states where produced. 80% to 85% of crude petroleum, and its products, at some time moves in inter-

state commerce, and the course or the stream thereof is from the well mouth to the refinery, from there to storage depots, and thence to the retail filling stations, which are the final destination for a very large part of the gasoline sold for purchase by the ultimate consumer. The refining process occupies a comparatively small amount of time and is not relatively costly. If the ultimate destination is not more than 1,000 miles from the wells, by virtue of pipe lines and other facilities of transportation the total time consumed from the beginning of the journey at the well through the refinery to the ultimate consumer is not more than 12 days.

The Petroleum Industry is integrated to a very high degree throughout the nation. Probably 60% of the gasoline sold is controlled from the wells to the consumer by the larger oil companies, which own and operate or control a large proportion of all the filling stations in the country. There are, however, numerous independent filling station proprietors, of whom the defendant is one. A very large part, probably a majority, of the gasoline sold at filling stations is sold under the name of a particular brand identified with a particular company and made familiar to the public by extensive advertising of the large companies. A substantial amount of gasoline, however, sold mostly by independent producers, is unbranded and not largely advertised. This is the case with the defendant. It is said by the witnesses that the retail sale prices of gasoline are not fixed by agreement by the large companies but are highly competitive, their general uniformity being due to the keenness of competition; and that other dealers tend to follow the lead of the largest companies known as the market leaders.

There is substantial evidence to support the conclusion of fact that both locally and nationally the petroleum industry is peculiarly sensitive to price changes and it is said that a general diminution in price beginning in a local area *tends* to affect the wholesale price at the refinery which in turn re-acts on the price per barrel of crude petroleum when produced at the well. The over-production of oil at the source of supply has a direct effect on the refinery price and consequently on the retail selling price. It is said by the witnesses that the major ultimate effect of a severe diminution of prices at the wells is to cause the shifting of production from the stripper wells where the cost of pumping is relatively high, to the flush fields in Texas, Oklahoma and California where the oil can be produced without the expense of pump-

ing. And it is contended as an ultimate result that when the price of gasoline declines to such a great extent that it cannot be refined and sold at a price which will permit the refinery to pay to the producer a sum equal to or greater than the cost of production, the supply of crude oil will be *shifted* from the stripper wells in the 15 states other than Texas, Oklahoma and California, to the latter states where the oil can be produced without the expense of pumping and where the producer whose production flows freely from the well will be willing to accept practically any price that he can obtain, because if the oil is not taken as it flows it will in effect be lost to the well owner. And it is said this will entail abandonment of much valuable well equipment in the states having "stripper" wells, and waste of the oil supply therefrom, and thus cause impairment of national resources. The conclusion which is contended for by the Government as a fact is that the industry must be regarded as a national one which transcends state lines and which the states separately cannot effectively control inasmuch as what happens in one state affects many other states.

It is also established by the testimony that in the spring of 1933 (and for a considerable time prior thereto as I think is known as a matter of general knowledge) the industry, including the marketing branch, was in an unsound economic condition. The controlling cause of this may be a matter of opinion. Viewing the testimony in the light of general knowledge, a fair inference, I think, is that it was caused principally by very great over-production accentuated no doubt by some contraction in general purchasing power. It may also fairly be found from the testimony that the economic conditions affecting the industry have substantially improved since the Petroleum Code went into effect. The exact causes leading to this result may be a matter of opinion when the testimony is viewed in the light of general information. It is inferable that the regulation of the amount of oil produced and greater co-operation of the integrated industry and the independents in maintaining prices, is largely responsible for the result. There is no reason to disparage the influence of the regulatory and cohesive effect of the Petroleum Code as an important factor in the result.

It is also fairly to be found as a fact from the testimony that the practice of premium giving with sales of gasoline is discountenanced by the majority of dealers, including both the organized industry and the inde-

pendent dealers. The Code was adopted as a result of conferences of representatives of the industry in Chicago in June and July of 1933. A draft code was submitted to the Recovery Administrator and hearings were held upon it from June until August. The arguments of opponents of the prohibition of giving premiums were said to have been heard but the defendant individually says that he personally was not given a hearing although he requested it. He has not assented to the Code in any way. On August 28, 1933, the President designated the Secretary of the Interior to be the Administrator of the Petroleum Code, and the latter appointed the Petroleum Administrative Board, the secretary of which on September 11, 1933, held additional hearings on proposals for changes in certain provisions of the Code including the anti-premium rule. It is said the organization and persons opposing Rule 17 were given every opportunity to be heard. The conclusion was that Rule 17 should not be changed. In this connection defendant's counsel calls attention to a publication by the National Recovery Administration described as "Release No. 5328" dated May 25, 1934, in which National Recovery Administrator Hugh S. Johnson announced a new policy for regulation of the use of premiums "which will be applicable to all Codes hereafter approved and which will govern modification of inconsistent provisions in codes already approved if such modification is sought by the affected industry or to relieve hardships caused by abuses." After noting that "the premium problem has proved a troublesome one" and that manufacturers and distributors of goods used very exclusively for premiums to be given with the sale of various articles of merchandise had complained of the anti-premium rule in certain of the industrial codes, it was announced as the general policy of the Recovery Administrator for the future that "there should be no general provision prohibiting the use of premiums" although it was further said that in exceptional cases (apparently not including the defendant's premium practice), the prohibition might properly be continued. However, counsel for the Government point out that the general National Recovery Administrator is not in charge of administration of the Petroleum Code which has been committed by the President to the Secretary of the Interior, and also that no recent action has been taken by the Petroleum Industry to change Rule 17 of its Code which still remains in full force, and therefore there is no basis for the position of the defendant's counsel that this case is now or will likely shortly hereafter be a moot one.

The principal stated objections to the trade practice of giving premiums are said to be as follows. The practice *tends* to cause price wars or lower price levels in the areas surrounding the station giving the premiums, and is said to be more objectionable than *direct price cutting* because it appeals to the purchaser on the basis of "something for nothing," and in the confusion of values which it engenders, and it cannot be definitely met by a reduction in price. It is further said that the effect of the premium giving practice is greater in the petroleum industry than in others because of the extreme price sensitiveness of the gasoline market, in connection with the relative inelasticity of the consumer demand. The result is that the premium giving dealer increases his business at the expense of his competitor rather than by the creation of new consumers. And this in turn leads to a direct price reduction, which leads to further reprisals and generally unstabilizes retail price uniformity in the particular area. It is also said by some of the witnesses that these price wars sometimes spread over considerable areas and in some places over state lines.

It appears that the retail sale price of gasoline is and for some time past has been less stable in Hagerstown, where the defendant's principal filling station is located, and in relation to which the larger part of the testimony relates, than in other places in Maryland notably in Baltimore City. This condition is attributed to the defendant's business practice. But in this connection, as bearing on the ultimate question involved, it is importantly to be noted that there is nothing in the evidence to show, despite the fact that the defendant's practice has prevailed for several years in the past, that the price disturbance area has been more than local. It has had no general effect even in Maryland, and has apparently not spread to the adjoining states of Pennsylvania or West Virginia which are within a few miles of Hagerstown. Occasionally a customer from some nearby point in Pennsylvania may be attracted to the plaintiff's Hagerstown station on some premium giving day but the fifty cent toll charge on the Potomac River Bridge leading to West Virginia from Hagerstown doubtless is an insuperable deterrent in attraction of customers from West Virginia.

The defendant justifies his business practice on the ground of necessity, in that he sells an unbranded gasoline and his station in Hagerstown, run in connection with a gen-

eral merchandise store, is at a comparatively remote location, not on any generally travelled highway, and he would not be able to conduct his business with reasonable profit unless he stimulated sales (on the same cash price basis charged by his more favorably situated competitors) by the premium inducement. He does not operate his station on Sunday although most of his competitors do. His practice is to advertise an accurate description of what articles of glassware or chinaware, sometimes constituting parts of complete sets, will be given to purchasers of a certain quantity of gasoline, on Saturday (and sometimes on Wednesday). This has materially increased the amount of his gallonage sales which run from 38,000 to 40,000 gallons a month in Hagerstown and considerably less at his other filling stations.

Shortly summarized, the Government's factual argument in support of its contention that the defendant's premium practice directly and substantially affects the flow of interstate commerce, is this: (1) That defendant's practice tends to and has unstabilized the retail gasoline price in Hagerstown, Maryland; (2) that the local price war *may* extend beyond the particular locality; (3) that *if* it does extend very greatly it may, by undue lowering of retail prices, in turn lower the refinery price which in turn will react unfavorably on the producers' prices and (4) *may* go to such an extent in lowering prices that the "stripper" wells will be put out of business and thus shift the entire production to the "flush" wells of Texas, Oklahoma and California with the result that the normal flow of petroleum from the 15 states having stripper wells will be stopped and the interstate commerce in petroleum *diverted* to the flush fields of Texas, Oklahoma and California.

It is thus seen that the precise question presented in this case is whether on the evidence the defendant's practice directly and substantially affects interstate commerce and is thus brought within the prohibitive power of Congress to regulate commerce among the states.

The position of counsel for the Government is "that the legal principles applicable are well established and the problem for this court to decide is predominantly a factual one which must be determined in the light of the testimony." So viewed, my ultimate finding of fact on the whole testimony is that the defendant's activity sought to be enjoined does not substantially affect or burden commerce among the states, and to the ex-

tent, if at all, that it does tend to in some way affect it, its influence is *not direct*, but only "accidental, secondary, remote, or merely probable." Swift v. United States, 196 U. S. 375, 397, 25 S. Ct. 276, 279, 49 L. Ed. 518. Treating the issue as one of fact only, it is difficult to see *how* the defendant's practice has had or is now having any material effect on interstate commerce. The occasional customers attracted from Pennsylvania are exercising an individual privilege of buying in a particular market (as one may prefer to buy some goods in New York or Philadelphia rather than in Baltimore), and anyhow the amount of such purchases as shown by the evidence is negligible. The amount of gasoline brought into Maryland or Pennsylvania is not diminished by the defendant's premium practice, as it is conceded the consumer demand is "inelastic." Even if it were, the effect would be remote and not direct, so far as interstate commerce is concerned, in the absence of an intent on the part of the defendant acting in concert with others, as to which there is no evidence here. United Leather Workers v. Herkert, 265 U. S. 457, 471, 44 S. Ct. 623, 68 L. Ed. 1104, 33 A. L. R. 566. The only substantial effect on commerce among the states which might conceivably result from a combination of many possibilities, is the ultimate diversion of the petroleum supply from other states to Texas, Oklahoma and California. (In the particular case the defendant's supply comes from Texas anyhow.) But such a possibility is speculative and uncertain in the extreme. The only direct effect of the defendant's premium practice is some diminution of the volume of sales of his competitors—a purely local matter.

But I doubt that the issue here is factual only. The important question is rather the legal effect of the facts, and this in turn depends on the proper conception of the power of Congress under the Commerce Clause over commerce that is intrinsically of itself purely intrastate. And here counsel for the parties are far apart. As I see the case, this is the dominant issue—one of constitutional law.

This particular question has heretofore been considered by other District Courts with diverse conclusions. In the case of United States v. Suburban Motor Service Corporation (D. C.) 5 F. Supp. 798, on a motion for restraining order, apparently presenting in substance the above outline of facts, District Judge Barnes, of the Northern District of Illinois, held that this particular provision of the Petroleum Code was not within the interstate commerce power of Congress. A con-

trary conclusion was reached by Justice Adkins of the Supreme Court of the District of Columbia in Victor v. Ickes, 61 Wash. Law Rep. 875. (Note II.)

The question presented is, of course, of very great constitutional and economic importance. Its solution necessarily depends upon the extent of the power of Congress under the Commerce Clause in the Constitution as interpreted by the Supreme Court. Counsel draw different conclusions as to the effect of the important cases. From a study of these decisions I reach the conclusion that the defendant's activities are beyond the reach of congressional power under the interstate commerce clause. I will give the reasons for this conclusion as briefly as permitted by the importance of the subject-matter and the number of relevant decisions of the Supreme Court.

The question presented is one of our fundamental law. The federal government has, of course, only delegated powers. Unless power is granted by the Constitution to the federal government it is retained by the states. It is well known to students of our constitutional history that the states were reluctant to surrender their individual sovereign powers. Probably the most impelling considerations arising from the contemporary conditions were the need for a greater taxing power and the need for regulated commerce among the states particularly in the sense of protecting individual states from obstructing or impeding interstate commerce. But the grant by the states to Congress of the power to regulate commerce did not include all commerce but only that with foreign nations, the Indian tribes and "among the several states." No power granted to Congress is more important to the welfare of the nation than that to regulate commerce among the several states. The country could not have obtained its economic prosperity without this delegated power. Within the scope of the grant, the power of Congress is unlimited. Under it we have, as familiar instances of its exercise, the Interstate Commerce Act, the Sherman Anti-Trust Act, the Federal Trade Commission, the Pure Food and Drug Law, and now the National Recovery Act, as well as even more recent legislation. The comprehensive scope of the power within its proper orbit has been recently summarized by the Chief Justice in Texas & N. O. R. Co. v. Railway Clerks, 281 U. S. 549, 570, 50 S. Ct. 427, 433, 74 L. Ed. 1034, in these words:

"The power to regulate commerce is the

Note II. Both these cases were heard on motions for preliminary injunction on affidavits instead of full testimony in open court. A reading of the respective opinions shows that the extent of price cutting in the Detroit area (the . Victor Case) was much more severe than in Chicago (the Suburban Case) or here in this case. It is possible to attribute the different results in some part to the facts as found in the respective cases, but it seems much more probable that different views of the law controlled the decisions. Similar questions have recently been decided by other District Courts. In U. S. v. Lieto (D. C. N. D. Tex.) 6 F. Supp. 32, Judge Atwell quashed informations against a local filling station proprietor, alleging violation of the Petroleum Code relating to wages and hours of service of an employee. The Government there contended that the defendant's business activities directly burdened interstate commerce, but the court held it to have only a "mythical indirect" effect. In Hart Coal Corporation v. Sparks (D. C. W. D. Ky.) 7 F. Supp. 16, Judge Dawson granted an injunction against the enforcement of orders of the Administrator of National Recovery under the Code for Bituminous Coal, on the ground, among others, that the plaintiff's coal mining in Kentucky was not within the reach of the Recovery Act. In Richmond Hosiery Mills v. Camp (D. C. N. D. Ga.) 7 F. Supp. 139, May 18, 1934, Judge Underwood in a written opinion refused to enjoin the application of the Hosiery Code to the plaintiff's manufacturing conditions, where it was also engaged in interstate commerce. In U. S. v. Spotless Dollar Cleaners (D. C. S. D. N. Y.) 6 F. Supp. 725, March 31, 1934, Judge Knox enforced the price provisions of the Cleaners and Dyers Code against a New York corporation receiving goods from patrons in New York City and having them cleaned at the plant of its subsidiary corporation in New Jersey. In U. S. v. Victor (E. D. Mich.) the report of a master on evidence seemingly similar to that in Victor v. Ickes, 61 Wash. Law Rep. 875, supra, reaches the same conclusions as those of Judge Adkins. So far as I am advised the report has not yet been ruled on by the District Judge. In Amazon Petroleum Corp. v. Railroad Comm. (D. C.) 5 F. Supp. 639, District Judge Bryant held that the Petroleum Code was not applicable (under the commerce power) to oil producers in Texas, and enjoined its enforcement, but the Circuit Court of Appeals for the Fifth Circuit reversed, on somewhat different considerations. 71 F. (2d) 1.

power to enact 'all appropriate legislation' for its 'protection or advancement' (The Daniel Ball, 10 Wall. 557, 564, 19 L. Ed. 999); to adopt measures 'to promote its growth and insure its safety' (County of Mobile v. Kimball, 102 U. S. 691, 696, 697, 26 L. Ed. 238); to 'foster, protect, control, and restrain' (Second Employers' Liability Cases, 223 U. S. 1, 47, 32 S. Ct. 169, 174, 56 L. Ed. 327, 38 L. R. A. (N. S.) 44)."

■ Equally is it well settled that, outside of the boundaries of the power given, the people of the states, and the states themselves, by permissible constitutional legislation, are at liberty to regulate their internal commerce and affairs free of the dominion of Congress. Gibbons v. Ogden, 9 Wheat. 1, 195, 6 L. Ed. 23; Hill v. Wallace, 259 U. S. 44, 68, 42 S. Ct. 453, 66 L. Ed. 822; Minnesota Rate Cases, 230 U. S. 352, 410, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; Packer Corporation v. Utah, 285 U. S. 105, 111, 52 S. Ct. 273, 76 L. Ed. 643, 79 A. L. R. 546; Utah Power & Light Co. v. Pfost, 286 U. S. 165, 52 S. Ct. 548, 76 L. Ed. 1038; Superior Oil Co. v. Mississippi, 280 U. S. 391, 50 S. Ct. 169, 74 L. Ed. 504; Hammer v. Dagenhart, 247 U. S. 251, 272, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724; Oliver Iron Co. v. Lord, 262 U. S. 172, 42 S. Ct. 526, 67 L. Ed. 929; Kidd v. Pearson, 128 U. S. 1, 9 S. Ct. 6, 32 L. Ed. 346; East Ohio Gas Co. v. Tax Commission, 283 U. S. 465, 51 S. Ct. 499, 75 L. Ed. 1171. But, as by article 6 "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof * * * shall be the supreme Law of the Land," the Supreme Court has by construction held that the power of Congress to regulate commerce among the states necessarily includes the power to prohibit either state legislation or particular activities within the boundaries of the state which obstruct interstate commerce (as, for instance, conspiracies to restrain interstate commerce forbidden by the Sherman Anti-Trust Act [15 USCA §§ 1–7, 15 note]); but again, in view of the dual nature of our Government and the reserved rights of the states, it has time and again been definitely pointed out by the Supreme Court that this necessary extension of federal power beyond the literal wording of the Constitution, cannot be expanded to the extent of regulations which only *remotely or indirectly* affect interstate commerce; and the regulatory power of Congress with respect to transactions internal to the state may extend only to such activities as *directly* and substantially burden, obstruct or impede the free flow of interstate commerce. The particular subject (that is the line of demarcation between federal and state power under the commerce clause) was elaborately considered in the Minnesota Rate Cases, 230 U. S. 352, at page 410, 33 S. Ct. 729, 745, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18, where the present Chief Justice, speaking for the court, said:

"Again, it is manifest that when the legislation of the state is limited to internal commerce to such degree that it does not include even incidentally the subjects of interstate commerce, it is not rendered invalid because it may affect the latter commerce indirectly. In the intimacy of commercial relations, much that is done in the superintendence of local matters may have an indirect bearing upon interstate commerce. The development of local resources and the extension of local facilities may have a very important effect upon communities less favored, and to an appreciable degree alter the course of trade. The freedom of local trade may stimulate interstate commerce, while restrictive measures within the police power of the state, enacted exclusively with respect to internal business, as distinguished from interstate traffic, may in their reflex or indirect influence diminish the latter and reduce the volume of articles transported into or out of the state. It was an objection of this sort that was urged and overruled in Kidd v. Pearson, 128 U. S. 1, 9 S. Ct. 6, 32 L. Ed. 346, 2 Inters. Com. Rep. 232, to the law of Iowa prohibiting the manufacture and sale of liquor within the state, save for limited purposes."

See, also, Stafford v. Wallace, 258 U. S. 495, 521, 42 S. Ct. 397, 66 L. Ed. 735, 23 A. L. R. 229; United Mine Workers v. Coronado, 259 U. S. 344, 408, 413, 42 S. Ct. 570, 66 L. Ed. 975, 27 A. L. R. 762; Hammer v. Dagenhart, 247 U. S. 251, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724; Anderson v. Shipowners Ass'n, 272 U. S. 359, 364, 47 S. Ct. 125, 71 L. Ed. 298; United Leather Workers v. Herkert, 265 U. S. 457, 467, 44 S. Ct. 623, 68 L. Ed. 1104, 33 A. L. R. 566; Industrial Ass'n v. United States, 268 U. S. 64, 77, 80, 82, 83, 45 S. Ct. 403, 69 L. Ed. 849.

In considering the potential effect of the defendant's business practice, it is relevant to determine the intrinsic nature and quality of the act sought to be prohibited. In the first place it is an entirely lawful activity under both the state and the federal law (apart from the effect of the Code under the Recovery Act). Its entire legality in Maryland (and the contrary is not made to appear

as to Pennsylvania) was long ago established by the Maryland Court of Appeals in Long v. State, 74 Md. 565, 22 A. 4, 6, 12 L. R. A. 425, 28 Am. St. Rep. 268, where, in holding an Act of the Legislature which undertook to prohibit *all* gift enterprises, unconstitutional as affecting those not involving chance, the court said:

"Such a regulation of trade is, in our opinion, not only unwise, but unlawful, and unlawful because it is necessary neither for the health, safety, nor welfare of the people, and which in its operation would be oppressive and burdensome. People v. Gillson, 109 N. Y. 389, 17 N. E. 343 [4 Am. St. Rep. 465]; Matter of Application of Jacobs, 98 N. Y. 98 [50 Am. Rep. 636]; Butchers' Union Co. v. Crescent City Co., 111 U. S. 746, 4 S. Ct. 652 [28 L. Ed. 585]; Toledo W. & W. R. Co. v. City of Jacksonville, 67 Ill. 37 [16 Am. Rep. 611]."

See, also, State v. Hawkins, 95 Md. 133, 51 A. 850, 93 Am. St. Rep. 328; State v. Caspare, 115 Md. 7, 80 A. 606; State v. Seney, 134 Md. 437, 107 A. 189 (upholding an annual license fee of $1,500 on trading stamp business). Williams v. Standard Oil Co., 278 U. S. 235, 49 S. Ct. 115, 73 L. Ed. 287, 60 A. L. R. 596, held invalid a Tennessee statute the main object of which was to fix prices for sale of gasoline (Note III) and incidentally prohibited a dealer from giving a gratuity to purchasers. As to the latter, it was said, at page 244 of 278 U. S., 49 S. Ct. 115, 118:

"It seems clear that these provisions are mere appendants in aid of the main purpose; but, if treated as separable, they are unconstitutional restrictions upon the right of the private dealer to fix his own prices and fall within the principle of the decisions already cited."

The Government's contention that the premium practice is a burden on interstate commerce does not come before the court with the impressiveness of a congressional declaration to that effect. The Recovery Act in its general recital as to the existing economic emergency makes no specific declaration against this particular business practice as affecting commerce generally or in relation to any specific industry. In the practical working out of the Codes it appears that there has been heretofore no uniformity in prohibiting premium giving and it has seemingly been left to a vote of a majority of those engaged in the particular industry to determine whether the practice shall be prohibited by its code. The great majority do not prohibit it. And, as has already been stated, it would now appear that as a general policy the prohibition is to be abandoned for the future. These observations are made not for the purpose of questioning the finality of the codes as proclaimed by the President, but merely to show that even in the administration of the Act under the powers delegated by Congress, there is no uniform condemnation of the practice; from which it is fairly inferable that there is no clear conviction in administrative circles that the practice constitutes a real burden upon or obstruction to the free flow of interstate commerce generally. Further evidence of the uncertainty as to the desirability of uniformity in the prohibition is found in Rule 17 itself, which contemplates exception to its application to be made by the Planning and Co-Ordination Committee, but on what principle does not appear. The practice of premium giving in the sale of merchandise is not novel or unusual. At least until the recovery codes became operative, and especially where it involves no element of chance or lottery, it has been quite common in a large number of states. (Note IV.)

Note III. It is said by counsel for the Government that the authority of this case must be considered to have been much shaken by Nebbia v. New York, 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940, because there the Supreme Court upheld a New York statute fixing the price for retail sale of milk. But a reading of the Nebbia Case does not lead to this conclusion. The Williams Case is clearly not overruled but only disapproved to the extent that the decision was put upon the ground that the sale of gasoline was not "affected with a public interest," rather than upon the ground that the law was found arbitrary in its operation and effect.

Note IV. The extent of the practice is

indicated by the number of judicial decisions to the effect that statutes prohibiting the use of trading stamps on merchandise amount to an unconstitutional interference with liberty and permit a deprivation of property without due process of law. Some of the cases to this effect, cited by counsel for the defendant are: State v. Hawkins, 95 Md. 133, 144, 51 A. 850, 93 Am. St. Rep. 328; State v. Caspare, 115 Md. 7, 80 A. 606; City & County of Denver v. United Cigar Stores Co., 68 Colo. 363, 189 P. 848 (1920); United Cigar Stores Co. v. People, 68 Colo. 546, 190 P. 1117 (1920); Opinion of Justices, 226 Mass. 613, 115 N. E. 978 (1917); Commonwealth v. Sisson, 178 Mass. 578, 60 N. E. 385; Montgomery v.

The importance of a direct congressional finding with respect to whether a particular activity within a state constitutes a burden on interstate commerce is seen from a comparison of Hill v. Wallace, 259 U. S. 44, 42 S. Ct. 453, 458, 66 L. Ed. 822, with Chicago Board of Trade v. Olsen, 262 U. S. 1, 43 S. Ct. 470, 67 L. Ed. 839. In the former the court declined to sustain the Act of Congress known as the Future Trading Act, 42 Stat. 187 (professedly based on the taxing power) as a regulation of commerce, in the absence of congressional declaration that the activities taxed burdened interstate commerce. Chief Justice Taft said:

"It follows that sales for future delivery on the Board of Trade are not in and of themselves interstate commerce. They cannot come within the regulatory power of Congress as such, unless they are regarded by Congress, from the evidence before it, as directly interfering with interstate commerce so as to be an obstruction or a burden thereon."

While in Board of Trade of Chicago v. Olsen, 262 U. S. 1, 43 S. Ct. 470, 67 L. Ed. 839, the court upheld the subsequent Act of Congress known as the Grain Futures Act (7 USCA §§ 1–17) as an exercise of power to regulate interstate commerce, after Congress had made an express finding upon the subject.

In this connection it is also not irrelevant to note that the National Industrial Recovery Act specifically deals with the subject of price cutting in section 4 (b), 15 USCA § 704 (b) and there provides, as a remedy against the practice if found destructive in a particular industry, after hearing and public announcement by the President, for the licensing of that industry, and the prohibition of engaging therein under penalty without such license or after revocation thereof. No such procedure has been here taken, and the subsection was limited in duration to one year from June 16, 1933. And "oil regulation" is expressly dealt with in section 9 (c) of the Act (15 USCA § 709 (c), authorizing the President to prohibit interstate transportation of oil produced or withdrawn from storage in excess of the amount allowed by state law. See Amazon Petroleum Corp. v. R. R. Comm. of Texas (D. C.) 5 F. Supp. 633; Id. (D. C.) 5 F. Supp. 639, the latter reversed on appeal by the Fifth Circuit; Champlin Refg. Co. v. Commission, 286 U. S. 211, 234, 235, 52 S. Ct. 559, 76 L. Ed. 1062, 86 A. L. R. 403. This would seem to be striking at the root of the economic problem.

A study of the leading cases in which the Supreme Court has found that activities in *intrastate* commerce constituted a direct and substantial burden on *interstate* commerce affords no indication that the principle could constitutionally be applied to the defendant's activities in this case. Conceding that they may have a tendency to some extent to affect in some slight way the flow of interstate commerce, their influence is neither direct nor substantial. The mere statement of the defendant's contention on the facts above outlined carries this conviction. If we apply to the defendant's activities the empirical test alone we find that, although his business practice now complained of has been in vogue for several years past, it has never had more than

Kelly, 142 Ala. 552, 38 So. 67, 70 L. R. A. 209, 110 Am. St. Rep. 43; Ex parte McKenna, 126 Cal. 429, 58 P. 916; Ex parte Drexel, 147 Cal. 763, 82 P. 429, 2 L. R. A. (N. S.) 588, 3 Ann. Cas. 878; Ex parte West, 147 Cal. 774, 82 P. 434; Denver v. Frueauff, 39 Colo. 20, 88 P. 389, 7 L. R. A. (N. S.) 1131, 12 Ann. Cas. 521; Hewin v. Atlanta, 121 Ga. 723, 49 S. E. 765, 67 L. R. A. 795, 2 Ann. Cas. 296; United Cigar Stores Co. v. Stewart, 144 Ga. 724, 87 S. E. 1034; Territory v. M. A. Gunst & Co., 18 Hawaii, 196; Sperry & Hutchinson Co. v. State, 188 Ind. 173, 122 N. E. 584 (1919); Lawton v. Stewart Dry Goods Co., 197 Ky. 394, 247 S. W. 14, 26 A. L. R. 686 (1923); Sperry & Hutchinson Co. v. Owensboro (1912) 151 Ky. 389, 151 S. W. 932, Ann. Cas. 1915A, 373; O'Keefe v. Somerville, 190 Mass. 110, 76 N. E. 457, 112 Am. St. Rep. 316, 5 Ann. Cas. 684; Opinion of Justices, 208 Mass. 607, 94 N. E. 848; People ex rel. Atty. Gen. v. Sperry & Hutchinson Co., 197 Mich. 532, 164 N. W. 503, L. R. A. 1918A, 797 (1917); State ex rel. Simpson v. Sperry & Hutchinson Co., 110 Minn. 378, 126 N. W. 120, 30 L. R. A. (N. S.) 966; State ex rel. Hartigan v. Sperry & Hutchinson Co., 94 Neb. 785, 144 N. W. 795, 49 L. R. A. (N. S.) 1123; State v. Ramseyer, 73 N. H. 31, 58 A. 958, 6 Ann. Cas. 445; People ex rel. Madden v. Dycker, 72 App. Div. 308, 76 N. Y. S. 111; People ex rel. Appel v. Zimmerman, 102 App. Div. 103, 92 N. Y. S. 497; Winston v. Hudson, 135 N. C. 286, 47 S. E. 1023; State v. Dalton, 22 R. I. 77, 46 A. 234, 48 L. R. A. 775, 84 Am. St. Rep. 818; Trading Stamp Co. v. Memphis, 101 Tenn. 181, 47 S. W. 136; State v. Holtgreve (1921) 58 Utah, 563, 200 P. 894, 26 A. L. R. 696; State v. Dodge, 76 Vt. 197, 56 A. 983, 1 Ann. Cas. 47; Young v. Commonwealth, 101 Va. 853, 45 S. E. 327.

a merely local influence. And certainly the facts do not show that the defendant's conduct has in any way either directly or even remotely burdened or obstructed the free flow of gasoline into Maryland. It certainly has not diminished the flow in any way nor has it either increased or diminished the demand which is admitted to be relatively "inelastic." The only observable effect is that the defendant's business practice has attracted customers who otherwise probably would have patronized his competitors whose stations are more favorably situated and who sell a more widely advertised brand of gasoline. The plaintiff's argument on the facts in its final analysis comes to this. If the defendant's premium practice continues it *may* in the future (although it has not in the past) spread beyond state lines, and *if* the premium practice is indulged in by others in many other localities and extensive price wars develop, it is *possible* the retail price of gasoline may be so decreased that "stripper" wells can not operate with profit, thus diverting the source of supply and the course of interstate commerce in petroleum from numerous other states to Texas, Oklahoma and California. The mere statement of the contention implies so many conditions, speculations and bare possibilities, that it indicates at once the remoteness as contrasted with the directness of the defendant's activities in the relation of cause and effect. There are specific instances given by one or more witnesses based on personal observation of local price wars in gasoline which undoubtedly tend to show that in the localities affected there have been temporary upsets in stabilized prices. But the testimony as a whole does not carry conviction that premium practice has itself ever had a countrywide effect on gasoline prices. The facts, therefore, fall short of the proposition outlined in Board of Trade of Chicago v. Olsen, 262 U. S. 1, 40, 43 S. Ct. 470, 478, 67 L. Ed. 839, where the Court said:

"The question of price dominates trade between the states. Sales of an article which affect the country-wide price of the article directly affect the country-wide commerce in it."

Nor can we disregard the consideration that this Petroleum Code does not itself undertake to fix and stabilize prices although it does prohibit premium giving which merely has the *tendency to create price cutting*. Whether the conclusion not to directly fix prices (and thus prevent price cutting) was based on legal or economic grounds may be unimportant, but in considering the directness or remoteness of premium giving as a burden on interstate commerce, it is relevant to note that the remote and not the proximate cause of such alleged interference is alone prohibited.

The defendant is not acting in combination or conspiracy with others. His business is not even that of a partnership or corporation. There is not the slightest evidence to show that he had any intention to restrain, burden or affect interstate commerce in any way. He is obviously not within the purview of the Sherman Act and the cases upon that Act are clearly not applicable here except for their illustration of the principle as to what constitutes direct interference with interstate commerce by its restraint.

No case decided by the Supreme Court, so far as I am aware, under the Sherman Law or otherwise relating to the commerce power of Congress has upheld an Act of Congress striking at purely internal state activities, by legislation or private actions, unless the local action directly burdened interstate commerce. This was the view of all the opinions, for the court and the dissent (including the dissent of Mr. Justice Holmes) in the Northern Securities Case, 193 U. S. 197, 331, 395, 402, 24 S. Ct. 436, 48 L. Ed. 679. And no case in which the court has found the existence of a direct effect on interstate commerce presented a factual situation in any way resembling the present in its weakness and remoteness as affecting interstate commerce. The Shreveport Railroad Rate Case (234 U. S. 342, 34 S. Ct. 833, 58 L. Ed. 1341) and its followers obviously have no factual similarity to this case.

The Supreme Court cases particularly relied upon by the Government are Bedford v. Stone Cutters Ass'n, 274 U. S. 37, 47 S. Ct. 522, 71 L. Ed. 916, 54 A. L. R. 791; Coronado v. United Mine Workers, 268 U. S. 295, 45 S. Ct. 551, 69 L. Ed. 963; Stafford v. Wallace, 258 U. S. 495, 42 S. Ct. 397, 66 L. Ed. 735, 23 A. L. R. 229; and Board of Trade v. Olsen, 261 U. S. 1, 43 S. Ct. 470, 67 L. Ed. 839. None of them presented a factual situation at all similar to the present case. In the Bedford Case the suit for injunction was based on the Sherman Anti-Trust Act (15 USCA §§ 1–7, 15 note) involving a conspiracy of stone cutters which had the actual or threatened effect of placing a practical embargo on interstate shipment of plaintiff's limestone produced in Indiana. The Coronado Case presented a similar situation under the Sherman Act involving limitation of interstate traffic in coal. Stafford v. Wallace and the Board of Trade v. Olsen were of an entirely different nature. In the former the court upheld the Packers

and Stock Yards Act of 1921 (7 USCA § 181 et seq.) and in the latter the Grain Futures Act of 1922 (7 USCA §§ 1–17) as valid legislation, despite the fact that the activities regulated were internal to a particular state where they directly affected an established, constant and recurrent flow of a stream of interstate commerce, in the one case in livestock and meat products, and in the other in grain, from the west to the east (through Chicago as a "throat"), by monopolistic charges in the one case and countrywide effect on prices in the other. These four cases do undoubtedly establish that an act internal to a particular state may fall within the commerce power of Congress to regulate as affecting interstate commerce, but they do not decide that the power exists unless the effect is direct and substantial. Both were anticipated by and based largely on Swift v. U. S., 196 U. S. 375, 397, 25 S. Ct. 276, 279, 49 L. Ed. 518, where the effect on interstate commerce was "not accidental, secondary, remote, or merely probable."

The defendant's position is not merely that his activities are not interstate in nature but are of such character that they cannot and do not directly or substantially affect interstate commerce. The defendant, as an individual, is not in a position to have any such power over interstate commerce as was possessed by the journeymen stone cutters in the Bedford Case or the United Mine Workers in the Coronado Case. Nor was his power of controlling business and affecting prices in any way comparable either in qualitative or quantitative effect to that of the plaintiffs in Stafford v. Wallace and Chicago Board of Trade v. Olsen. He is a mere individual proprietor of four gasoline filling stations of which there are several hundred thousand in the whole country. The quantity of gasoline that he sells is comparatively negligible as compared with the industry as a whole. He is not acting in combination with any other person or corporation and lacks, therefore, the power that exists in wide combinations of similarly interested persons desirous of achieving a particular result. To conclude that his activities in his relatively minor retail business could have any direct and substantial effect on the flow in interstate commerce of petroleum products constituting the third largest industry in the United States seems to me wholly fanciful. If it be said, unless he is prohibited in premium giv-

ing others may adopt the same course, and the aggregate of their several respective activities may directly affect the price of gasoline and divert the flow from the higher priced stripper wells to Texas, Oklahoma and California, it can, I think, be replied that individual and unconcerted action of this kind cannot be made the basis of congressional regulation under the commerce clause. A so-called general "buyers' strike" might very well directly and substantially affect prices for gasoline but would hardly be thought to justify congressional regulation under the commerce clause.

I do not overlook the language in the Act itself with respect to interstate commerce. In section 7 (d) (15 USCA § 707 (d) it is defined in the manner customary in Acts of Congress based thereon. But in section 3 (f), 15 USCA § 703 (f) imposing the criminal sanction, it is referred to as "any transaction in or affecting interstate or foreign commerce." It is, however, clear that the Act itself cannot by its own terms expand the power beyond that given by the Constitution, and indeed I do not understand the contrary is here contended. Eisner v. Macomber, 252 U. S. 189, 202, 40 S. Ct. 189, 64 L. Ed. 521, 9 A. L. R. 1570.

While the argument of counsel for the Government stresses the facts as the dominant factor for the decision of the case, there seems to be implicit, in their argument of the law, a contention for a broader conception of the commerce clause than is generally understood. (Note V.)

What is suggested is that "commerce among the states" properly understood is not limited in concept to mere interstate movement of persons and things from one state into or through another, but includes such activities within a state as "affect" the commerce of other states. Particular reference is made to the phrase used by Chief Justice Marshall in Gibbons v. Ogden, 9 Wheat. 1,-194, 6 L. Ed. 23, where he said: "Comprehensive as the word 'among' is, it may very properly be restricted to *that commerce which concerns more states than one,*" and to the phrase used by the present Chief Justice in the Minnesota Rate Cases, 230 U. S. 398, 33 S. Ct. 729, 739, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18:

"The words 'among the several states' distinguish between the commerce which con-

---

Note V. See the article by Robert L. Stern, of counsel in this case, in 48 Harvard Law Review, No. 8, entitled "That Commerce which Concerns More States Than One," in which this view of the commerce clause is interestingly developed at length.

cerns more states than one, and that commerce which is confined within one state *and does not affect other states.*" (Italics supplied.)

The concrete result sought is the expansion of the commerce clause to prohibit or regulate internal state activities where they, in the judgment of Congress, prejudicially affect the trade or commerce of other states, irrespective of physical movement among the states. More specifically, the contention would seem to be an argument for the overruling of Hammer v. Dagenhart, 247 U. S. 251, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724, which alone is thought to be the only necessary obstacle to this broader conception of the commerce power. It is, however, an unsound rule of construction which imports a meaning into a particular phrase in a judicial opinion, divorced from its context, and we must remember Gibbons v. Ogden and Minnesota Rate Cases in which the particular wording appears were essentially cases dealing with physical interstate movement, by ship and by rail. The same conception of the commerce clause is stated in another form. Where the general national welfare is involved, and the several states, or some of them are impotent to effectively act, then the federal government must, as a matter of necessity, have the power to act for all. The argument in this form is not new. It was advanced by the Government but very definitely rejected by the court in an opinion by Justice Brewer in Kansas v. Colorado, 206 U. S. 46, 89, 27 S. Ct. 655, 51 L. Ed. 956. The Tenth Amendment is conclusive against it. Kidd v. Pearson, 128 U. S. 1, 21, 9 S. Ct. 6, 32 L. Ed. 346.

█ In the discussion of the case reference has necessarily been made to economic conditions. I am not unmindful that the court is not concerned in any way with the economic policy of Congress or with the philosophy of the Recovery Act, and the discussion of it is made relevant only because the case as made by the Government is based so largely on economic considerations. It is said that the progress of our economic development in recent years is such that the whole country is now an economic unit, and furnishes for many industries, such as petroleum, a national market, which necessitates integrated regulation beginning with production in one state, transportation through others, and ending only with final consumption in another. And it is manifest that the intended scope of the Recovery Act is as broad

as the assumed need for the regulation. As a policy it is obviously experimental and by its terms is made temporary only. Its basis is the declared national economic emergency. It is, however, clear that the emergency cannot expand the power in the commerce clause, not otherwise existing, and indeed it is not contended here that it can. Home Building & Loan v. Blaisdell, 290 U. S. 398, 425, 54 S. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481; Ex parte Milligan, 4 Wall. 2, 120, 18 L. Ed. 281.

I have not failed to envisage the Act as a whole and to appreciate its intended beneficent provisions, experimental as they are, for the general economic national welfare. Inviting the co-operative efforts of industry under administrative leadership, it is a stimulating and encouraging appeal to the business interests of the country, large and small, by self help and if necessary self sacrifice, to rescue themselves from the economic depression. It is probably the most comprehensive and constructive effort along this line ever proposed by a democratic form of government. To the extent that it is within the power of Congress to enact it requires obedience from all citizens, but beyond that power it can only invoke voluntary co-operation. When the injunctive power of enforcement is asked against the individual citizen who does not assent to the administrative interpretation of the scope of the Act, the duty of the court is clear to apply the fundamental law of the land, and to declare that the Act or the administrative interpretation thereof does not reach the defendant if it is beyond the power given by the Constitution. The vital personal political rights of the citizen are no less important than economic ease. Business depressions have heretofore come and gone, but the individual rights guaranteed by the Constitution must be enforced while it remains the law of the land.

I hold in this case that Rule 17 of Article V of the Petroleum Code is not enforceable against the defendant because he is not engaged in commerce among the states and his premium practice in the sale of gasoline does not directly burden the interstate commerce in petroleum or its products. And that is all that is here decided. In view of this conclusion it is unnecessary to discuss the other contentions of counsel set forth in their oral arguments and elaborate briefs of exceptional ability, for which I am much indebted to them.

My conclusion of law is that the bill must be dismissed. Counsel may submit the ap-

560

propriate order. I assume the findings of fact and conclusions of law herein are sufficiently specific to comply with Equity Rule No. 70½.